**AMERICAN SURETY CO. OF NEW YORK
et al. v. BAY CITY CATTLE CO. et al.\***

**(No. 8566.)**

(Court of Civil Appeals of Texas. Galveston.
Dec. 11, 1924. Rehearing Denied
Jan. 22, 1925.).

1. **Animals ⬅➡26(1)—Equitable lien of one advancing purchase money for cattle held ineffective as against agistor without knowledge thereof.**

. The equitable lien of one advancing purchase money and transportation charges for cattle, it being only within knowledge of immediate parties, and not of record, *held* ineffective as against lien of agistor who did not know of such transaction and dealt with purchaser of cattle, who had possession and was apparent owner.

2. **Animals ⬅➡22—Contract for pasturing held not month to month contract but in nature of tenancy at will.**

An oral contract between owner of pasture and equitable mortgagor of cattle, for pasturing cattle, rate being fixed on basis of 35 cents per head per month, provided a certain number of head were kept there a minimum of six months, pasturage being payable in lump sum only when demanded or cattle removed, *held* in legal effect no different than tenancy at will, and was not a month to month contract.

3. **Chattel mortgages ⬅➡138(1)—Agistor's lien, arising under contract existing before filing of chattel mortgage, held superior to that of chattel mortgagee.**

Where oral contract for pasturing cattle, which was in nature of tenancy at will, was made and in part performed a month before execution and delivery of chattel mortgage on cattle, under Rev. St. art. 5664, agistor had superior lien to that of chattel mortgagee for all pasturage accruing before filing of mortgage and that becoming due thereafter; article 5671 not affecting superiority of agistor's lien.

4. **Chattel mortgages ⬅➡157(2)—Chattel mortgagee held to have impliedly consented to pasturing of cattle, thereby losing superiority of lien over that of agistor.**

Evidence that chattel mortgagee, furnishing purchase price and transportation charges for cattle, knew that mortgagor did not own a ranch and would have to put them in a pasture and incur pasturage for them, together with recitation in mortgage that cattle were in agistor's pasture, *held* to show an implied consent by mortgagee to pasturing of cattle with agistor; mortgagee thereby losing superiority of its lien over that of agistor.

5. **Appeal and error ⬅➡931(4)—Where no finding on particular question requested and none made, trial court presumed to have found in favor of prevailing party.**

Where chattel mortgagee of cattle contended that agistor had waived his lien by surrendering possession of portion of cattle, such waiver was a question of fact, and where mortgagee requested no finding of trial court that agistor waived its lien by such surrender and trial court made no such finding, but rendered judgment in favor of agistor, appellate court will presume that no such waiver was intended and that agistor's lien had not been waived.

. Error from District Court, Harris County; W. E. Monteith, Judge.

Action by the Bay City Cattle Company and others against the American Surety Company of New York and the National Cattle Loan Company. Judgment for plaintiffs, and defendants bring error. Affirmed.

Vinson, Elkins, Wood & Sweeton, Campbell, Myer, Simmons & Hawkins, and Fred R. Switzer, all of Houston, for plaintiffs in error.

Baker, Botts, Parker & Garwood, Barksdale Stevens, and Winston Carter, all of Houston, for defendants in error.

GRAVES, J. The facts underlying this cause were as follows:

J. C. Hybarger, an extensive operator in the buying and selling of cattle, purchased in Florida at least 740 head of cattle in accordance with an agreement between him and the National Cattle Loan Company, whereby it advanced money to its bank to pay drafts drawn by him to cover the purchase price of and transportation charges on the cattle to Texas; as security for the money so advanced, Hybarger attached to, or wrote on the drafts drawn therefor, a conveyance of the cattle from him to the bank for the benefit of the loan company; it was further the habitual practice between him and the loan company that, when cattle were thus bought by him and collected together, he would then execute a chattel mortgage on them to it to secure this money.

After the cattle were so purchased, Hybarger shipped them direct from Florida to the pasture of the Bay City Cattle Company in Brazoria county, Tex., where they were placed on July 23, 1920, under a contract between him and the cattle company, by which he was to pay pasturage on them at the rate of 35 cents per head per month; the cattle company at the time knowing nothing of his prior transaction with the loan company and being under the impression that the cattle were owned by him.

Thereafter, on August 21, 1920, after they had so been in the cattle company's pasture, and had been cared for by it since the preceding July 23d, Hybarger, who was then a resident of San Antonio, Bexar county, Tex., executed at Houston and delivered a chattel mortgage on these cattle to the loan company to secure his notes to it maturing in December of the same year in the total sum of $35,540, which instrument, however, was not filed for record in Brazoria county, where the cattle were located, until September 7, 1920, and of which execution and filing the cattle company had no actual knowledge or

notice, nor were they apprised of any claim under the mortgage, until in April, 1922.

On December 13, 1920, Hybarger sold and removed from the pasture 210 head of the cattle, about 70 had by that time escaped or died, and the remaining 460 head remained in there until April 20, 1922; none of the charges for pasturage or other services rendered were ever paid.

On April 20, 1922, the two companies referred to, the loan company and the cattle company, the former claiming the right to take and appropriate the remaining 460 head of the cattle pursuant to the terms of its chattel mortgage, and the latter asserting an agistor's or an equitable lien on them to secure the pasturage, branding, dipping, and vaccination charges thereon, amounting in all to $4,100.66, agreed that the controversy should be settled in a suit between them to be filed by the cattle company, whereupon the loan company executed a bond to the cattle company, with the American Surety Company of New York as surety, agreeing in effect to pay such of these charges as the loan company was either held liable to it for, or as might be determined to carry a superior lien on the cattle to the loan company's claim. The cattle were then surrendered to the loan company and this suit followed, being filed by the cattle company as plaintiff against the loan and surety companies as defendants, declaring upon the charges before described, and asserting both an equitable and a statutory lien on the cattle, superior to any claim under the chattel mortgage.

The cause was tried before the court without a jury; judgment first being entered in favor of defendants in error for $518, as for pasturage on the cattle for the first two months only, from July 23 to September 23, 1920, but later in the same term and on further argument, this decree was set aside and a judgment was entered for defendant in error for the full amount they sued for, $4,100.66, with interest from its date. From that recovery against them, the loan and surety companies prosecute this writ of error. The court below filed these conclusions of fact and law:

"Findings of Fact.

"(1) I find that J. C. Hybarger purchased the cattle in question in Florida for shipment to Texas; that, prior to the purchase of said cattle, he negotiated in St. Louis with the president of the National Cattle Loan Company for money to finance the purchase of said cattle; that thereafter the cattle were purchased and draft drawn on the National Stockyards Bank and paid by the National Cattle Loan Company; that thereafter the cattle were shipped to Texas and immediately placed in the pasture owned by the plaintiff in this case, with the knowledge of the defendant National Cattle Loan Company that the said cattle were to be shipped to Texas, and with their knowledge a short time thereafter the cattle were placed in the pasture owned by the plaintiff.

"(2) I find that the pasturage contract agreed upon was a month to month contract at the rate of 35 cents per head.

"(3) I find that, at the time of entering into said contract, J. C. Hybarger stated to Mr. Le Tulle, one of the plaintiffs in this case, that he thought said cattle would remain in said pasture for a period of at least six months.

"(4) I find that, at the time the chattel mortgage was executed on August 21, 1920, by J. C. Hybarger, the defendant National Cattle Loan Company knew that the cattle in question were in the pasture of the Bay City Cattle Company.

"(5) I find that, before the execution of said chattel mortgage, and at the time the cattle were placed in the pasture, or soon thereafter, J. C. Hybarger advised the National Cattle Loan Company where the cattle had been pastured and also the condition of the cattle.

"(6) I find that, at the time the cattle were placed in the pasture of plaintiff, J. C. Hybarger authorized the plaintiff to brand, dip, and vaccinate said cattle, which work was afterwards done, and I find that the charges made for said work were reasonable.

"(7) I find that J. C. Hybarger sold, on December 13, 1920, 210 head of said cattle to one Nevins, which were left in said pasture for a certain period of time, that, at the time said cattle were removed by Nevins, Mr. Le Tulle had knowledge that they were being removed, and that the rental charges had not been paid thereon up to December 13, 1920, the date of the sale of the cattle to Nevins; and I further find that, at the time Mr. Hybarger sold the cattle to Nevins, Mr. Le Tulle had no knowledge of said sale.

"(8) I find that on December 13, 1920, when the said 210 head of cattle were sold by J. C. Hybarger to one Nevins, said sale was made without the consent or knowledge of any duly authorized officer or agent of the Bay City Cattle Company. And I further find that the purchaser of said 210 cattle paid the full amount of pasturage from December 13, 1920, until the time they were taken out of said pasture.

"(9) I find that, at the time the balance of said cattle were disposed of by the defendant in this case, there was no equity over and above the amount of the indebtedness to them.

"(10) I find that the charge of the plaintiff for pasturing the cattle at the rate of 35 cents per head per month was reasonable.

"(11) I find that the pasturage of the cattle, as done by J. C. Hybarger, was necessary for the care and preservation of the cattle.

"(12) I find that the Bay City Cattle Company is a corporation, which has been dissolved since the institution of this suit, and that the plaintiffs are the directors and trustees of the dissolved corporation.

"(13) I find that the defendant American Surety Company of New York executed the bond herein sued upon as surety for the defendant National Cattle Loan Company.

"(14) I find that plaintiff had no actual notice of the execution or the filing of the chattel mortgage introduced in evidence until a short time prior to the removal of the cattle from the pasture of plaintiff.

"(15) I find that, at the time J. C. Hybarger bought the cattle in question in Florida, it was contemplated by the said Hybarger and the defendant National Cattle Loan Company that the said cattle would be shipped to Texas, and

would be pastured by Hybarger in pastures owned by persons other than J. C. Hybarger, and that the chattel mortgage in question was executed by J. C. Hybarger to secure the purchase price and expense of transporting said cattle to Texas, pursuant to the agreement between said Hybarger and National Cattle Loan Company had in the negotiations between them set out in section 1 hereof, of which agreement and negotiations the plaintiffs had no knowledge.

### "Conclusions of Law.

"(1) I conclude, as a matter of law, that the plaintiffs, as trustees and directors of the Bay City Cattle Company, are entitled to recover against the defendants herein the pasturage of the cattle from July 23, 1920, to April 21, 1922, at the rate of 35 cents per head per month, and that they are entitled to recover the reasonable charges proven on the trial of this case for the dipping, branding, and vaccinating said cattle.

"(2) I conclude, as a matter of law, that the plaintiffs, as directors and trustees of the Bay City Cattle Company, are entitled to judgment against the defendant National Loan Cattle Company and the American Surety Company of New York, jointly and severally, and that the defendant American Surety Company of New York is entitled to judgment over and against the defendant National Cattle Loan Company for the amount recovered by the plaintiffs herein against the American Surety Company of New York."

The controlling question the cause presents is, Whose claim against the cattle was superior, that of the loan company for the original purchase money it so advanced to Hybarger, or that of the cattle company for the pasturage and care the latter so furnished him?

While not accepting its second finding of fact, as hereinafter appears, we think upon the whole case that the trial court correctly resolved the issue in favor of the cattle company, mainly upon these considerations and conclusions:

[1] (1) While the advancement of the purchase money and transportation charges in the circumstances detailed gave the loan company an equitable lien on the cattle from the date thereof, as between it and Hybarger, yet, since none of these transactions were either of record or known to the cattle company, such lien was ineffective as against it, dealing as it did with Hybarger in possession of and the apparent owner of the cattle. It is true that Hybarger nowhere directly testified that he made a specific agreement at the time he arranged for the money to execute a mortgage to the loan company as security on these cattle when they were definitely located in Texas, but that is clearly the effect of the transaction, as he executed on July 16, 1920, and attached to the drafts a conveyance or bill of sale to them in its favor, which the undisputed evidence showed was only intended as a mortgage. As above stated, that had also been the invariable practice in their like dealings together; he buying and being the owner of the cattle, and giving it a mortgage thereon to cover the money advanced him for that purpose, after he had definitely located them somewhere.

Hence we think the agreement should be construed as evidencing an intention to create a lien, but as supporting our view that this equitable lien—existing under the facts here obtaining only within the knowledge of the immediate parties to it—although good as between them from the date of the drawing of the drafts, did not affect the rights of the cattle company thereafter innocently dealing out in Texas with the equitable mortgagor in possession of and owning the cattle, we cite: Articles 5654 and 5655 of the Revised Statutes of Texas; Berkey & Gay Furniture Co. v. Sherman Hotel Co., 81 Tex. 135, 16 S. W. 807; Lazarus v. Henrietta Nat. Bank, 72 Tex. 354, 10 S. W. 252; Consolidated Garage Co. v. Chambers, 111 Tex. 293, 231 S. W. 1072; Willys-Overland Co. v. Chapman (El Paso Court of Civil Appeals) 206 S. W. 978; Farmer v. Evans, 111 Tex. 283, 233 S. W. 101; Harling v. Creech, 88 Tex. 300, 31 S. W. 357; Parlin & Orendorff v. Davis (Tex. Civ. App.) 74 S. W. 952.

[2] (2) The trial court's second fact finding, "that the pasturage contract agreed upon was a month to month contract at the rate of 35 cents per head," is contrary to the real purport and effect of the undisputed evidence, and, in sustaining the cross-assignment of defendants in error raising the point, this court substitutes therefor its own finding that the contract was in effect a continuing one for an indefinite period, terminable at the will of either party like a tenancy at will, the stipulated pasturage rate being fixed upon the basis of 35 cents per month per head—provided 740 or more head were kept there a minimum of six months' time—but payable in a lump sum only when demanded or when the cattle were removed, and not by the month. The contract was a verbal one entered into July 23, 1920, between the cattle company's president, Mr. Le Tulle, and Mr. Hybarger, who alone participated in its making, and this is the gist of the testimony of both: It being mutually understood that Mr. Hybarger was to keep the cattle in the pasture as long as he desired. If there be details or circumstances tending otherwise, they are too slight to materially affect the substance of what they thus agreed upon. The parties themselves so acted under and treated the matter, no rent having ever been either demanded or paid upon the theory that it was due each month. Such an arrangement was in legal effect not different from a tenancy at will. Wood's Land. & Ten. §§ 14–38; Robb v. San Antonio Street Ry. Co.; 82 Tex. 392, 18 S. W. 707; Lea v. Hernandez, 10 Tex. 137;

Beauchamp v. Runnels, 35 Tex. Civ. App. 212, 79 S. W. 1105`; Hill v. Hunter (Austin Court of Civil Appeals) 157 S. W. 247.

[3] (3) Under such a contract, made and in part performed for 28 days prior to the execution and delivery of the chattel mortgage to the loan company, our statute, R. S. art. 5664, gave the cattle company, as an agistor, a prior and superior lien to any that might arise in favor of the loan company under its mortgage, not only for such pasturage as might be regarded as having accrued at the dates of the giving and filing of the mortgage, but for all that might thereafter become due, pursuant to the legal effect of the pasturage contract.

Neither, we think, is the lustre of this statutory lien in favor of the agistor in anywise dimmed by the presence in the same chapter 8 of our Lien Laws·of R. S. art. 5671, so strongly relied upon by plaintiffs in error. That article appearing as the last one in title 86 relating to liens in general, is not a part of the act creating liens in favor of agistors and others, and makes no attempt to establish a rule of priority between any of the many different liens dealt with in the title or in chapter 8 thereof leaving that question, as it was before, a justiciable one, to be determined by the courts under the facts of particular cases. It has been so construed, and we quote with approval the declaration of the Amarillo Court of Civil Appeals upon it, as follows:

"We think the purpose of this article was to preserve and maintain liens, rights, and priorities existing independent of the provisions of the statute, rather than to announce a rule for determining such matters within itself. Both chattel mortgage liens and mechanics' liens are treated under the title, though neither are created thereby; both having their existence independent of the statute. If, independent of the statute, the mechanic's lien would, under certain circumstances, be superior to a particular antecedent chattel mortgage, then this very article would, to a certain extent, impair the mechanic's lien if said article were to be construed as making the chattel mortgage lien superior."

Under our system of jurisprudence, no good reason appears from that fact alone for holding a lien created by statute to be of any less dignity than one arising in any other way, as at common law, and consequently, in the absence of some other and more potent consideration, it would get nowhere toward the establishment of its primacy here to regard the loan company's claim as having given rise to an equitable lien antedating its mortgage, as in fact we have regarded it in so far as concerns the parties to it. Of course, if it be looked upon from the standpoint of the subsequent chattel mortgage, as at this point is being done, we then simply have—between it and the agistor's claim—two statutory liens, neither of which, in the scheme of laws creating and dealing with them, is given preference over the other, their relative standing being left for independent determination.

This contract for pasturing the cattle, then, being a continuing one and the lien "to secure the amount of the charges against same" expressly given by the statute not being in anywise eclipsed or relegated to second place by the loan company's equitable or mortgage liens, under the operation of R. S. art. 5671, we think it plainly follows, under well-settled authority, that the cattle company's superior lien over any the mortgage might create for both pasturage and care, the reasonableness of the charges for this latter service not being questioned, became fixed by statute as of the date the cattle were thus placed in the pasture on July 23, 1920, and covered all amounts that thereafter accrued under the pasturage contract up to the time of their removal, which, under the facts, was also contemporaneous with the demand of defendants in error for their compensation. Berkey & Gay Furniture Co. v. Sherman Hotel Co., 81 Tex. 135, 16 S. W. 807; Brothers v. Mundell Munzesheimer Co., 60 Tex. 240; articles 5664 and 5671, Revised Statutes of 1911; Houston Nat. Exchange Bank v. De Blanc (Beaumont Court of Civil Appeals) 247 S. W. 897; Hudson v. Wilkerson, 61 Tex. 606; Goldfrank & Co. v. Young, 64 Tex. 432; Tombler v. Palestine Ice Co., 17 Tex. Civ. App. 596, 43 S. W. 896; Craig v. Martin, Bennett & Co. (Tex. Civ. App.) 102 S. W. 1172; Myar v. El Paso Grocery Co. (Tex. Civ. App.) 63 S. W. 337; National Exchange Bank v. Benbrook School Co. (Tex. Civ. App.) 27 S. W. 297; Wells v. Littlefield, 59 Tex. 556; First Nat. Bank v. McElroy, 51 Tex. Civ. App. 284, 112 S. W. 801. See, also, Case v. Allen, 21 Kan. 217, 30 Am. Rep. 425, cited with approval by our Supreme Court in Association v. Cochran, 60 Tex. 620.

These authorities, we think, reflect the true rule where the contract of the agistor, or one furnishing a service of the same character, has its inception prior to the execution and filing of a chattel mortgage and the charges thereunder have already begun to accumulate.

If there be cases holding to a contrary doctrine on the equivalent of the same state of facts, they cannot be followed; but many of those cited as so holding do not upon analysis do so, turning out to be grounded upon unlike conditions, materially different contractual or statutory provisions, or to lack the implied assent feature present here, to which we now come.

[4] (4) If, however, the chattel mortgage lien from and after the filing of the mortgage on September 7, 1920, should be regarded as prior in time to that of the cattle company, still, under the particular facts obtaining, we think it should be held sub-

ordinate in law, on the ground that the loan company impliedly assented to the subjection of the cattle to the statutory lien that arose in favor of the agistor. The trial court's quoted fact findings, none of which are attacked by plaintiffs in error as being unsupported by the evidence, especially Nos. 1, 4, 5, 10, 11, 14, and 15, alone import as much, but there were many other circumstances tending to establish such assent, among them: The testimony of the loan company's agent that he knew Mr. Hybarger didn't own any ranch and would both have to put the cattle in a pasture and incur the pasturage on them; the recitation in the mortgage itself that these cattle were in the cattle company's pasture in Brazoria county, as well as its further provisions inhibiting the mortgagor from taking them out of there without the mortgagee's written consent, giving the mortgagee a lien on all the "leased privileges, grass, feed, or water, used or to be used in maintaining said stock," securing it for advances it might make the mortgagor for that purpose, or for direct expenses it might incur in caring for and handling the stock, and finally declaring:

"It is expressly understood that the validity, interpretation, construction, and effect of this mortgage, as well as the note or notes aforesaid, shall be exclusively governed by the laws of the state of Texas, where this mortgage and said note or notes are made."

These recitations standing alone would seem to charge the mortgagee with knowledge of the fact that the pasturing of the cattle in Texas would subject them to a lien under our statute. Other facts and circumstances so tending were that Mr. Hybarger, in originally borrowing the money, told its officers that he would buy the cattle in Florida; and ship them to and put them in a pasture in Texas other than his own. Later on August 21, 1920, before executing the mortgage at Houston, he told them where the cattle were, of their bad condition, and how many had died; the undisputed evidence showing that the cattle on arrival at the pasture were in bad condition, had to be pastured, and required for their care and preservation the feeding, dipping, and vaccination furnished them by the defendants in error.

While the general rule is that a duly registered prior chattel mortgage is superior to a subsequently created lien, whether that of a mechanic or laborer, a landlord, or an agistor, as applied by our Supreme Court in American Type Founders' Co. v. Nichols, 110 Tex. 4, 214 S. W. 301, the courts also seem to recognize an exception in cases where the chattel mortgagee has—as we think clearly appears in this instance—impliedly assented to the subjection of the property to subsequent liens for necessary and beneficial service. None of this latter class of opinions has more aptly stated the reasons for the exception than that of Judge Brewer afterward an Associate Justice of the Supreme Court of the United States, for the Supreme Court of Kansas in Case v. Allen, supra, as follows:

"Now, the lien of the agistor is not the mere creature of contract; it is created by statute from the fact of the keeping of the cattle. The possession of the agistor was rightful, and the possession being rightful, the keeping gave rise to the lien; and such keeping was as much for the interest of the mortgagee as the mortgagor. The cattle were kept alive thereby; and the principle seems to be that, where the mortgagee does not take the possession, but leaves it with the mortgagor, he thereby assents to the creation of a statutory lien for any expenditure reasonably necessary for the preservation or ordinary repair of the thing mortgaged. Such indebtedness really inures to his benefit. The entire value of his mortgage may rest upon the creation of such indebtedness and lien, as in the case at bar, where the thing mortgaged is live stock, and the lien for food."

There are many like holdings, the courts determining that, under the circumstances applying, the mortgagee should be held to be estopped from asserting the priority of his mortgage lien, after so assenting to and acquiescing in the fixing of subsequent liens on the property by the mortgagor. Jones on Liens, § 691a; Lynde v. Parker, 155 Mass. 481, 30 N. E. 74; Hammond v. Danielson, 126 Mass. 294; Bank v. Laughlin (Tex. Civ. App.) 210 S. W. 617; Oriental Hotel v. Griffiths, 88 Tex. 581, 33 S. W. 652, 30 L. R. A. 765, 53 Am. St. Rep. 790; Houston Ex. Bank v. De Blanc (Tex. Civ. App.) 247 S. W. 897; McIlhenny v. Binz, 80 Tex. 1, 13 S. W. 655, 26 Am. St. Rep. 705; Ruppert v. Zang, 73 N. J. Law, 216, 62 A. 998.

We conclude that this implied assent feature, if no other, differentiates the case at bar from Masterson v. Pelz (Tex. Civ. App.) 86 S. W. 57, cited and relied upon by plaintiffs in error.

[5] (5) As concerns the claim that a pro tanto waiver of the agistor's lien resulted from its surrendering possession of 210 head of the cattle on December 13, 1920, we adopt, as correctly reflecting the state of the record and as expressive of our own view, this counter proposition of defendants in error:

"Waiver of liens surrendering possession is a question of fact, and the plaintiffs in error having requested no finding of the trial court that the defendants in error waived their liens by surrendering possession of the 210 head of cattle to Nevins under the circumstances of this case, and the trial court having made no such finding, it must be presumed that he found that no such waiver was intended, and that the lien had not been lost or waived, and any allowance for the pasture of those 210 head of cattle must be deemed to have been found by the trial court to have been secured by a lien on the remaining cattle, and that part of the judgment is therefore correct.'"

Further discussion is deemed unnecessary. The court has been much aided by able briefs and arguments upon both sides, and its appreciation is earnestly expressed.

The trial court's judgment has been affirmed.

Affirmed.