### DAY RANCH CO. v. HUBERT & WOODWARD et al.

#### No. 7483.

Court of Civil Appeals of Texas. Austin.

Oct. 3, 1930.

Rehearing Denied Oct. 15, 1930.

Dibrell & Starnes, of Coleman, for appellant.

Critz & Woodward, of Coleman, for appellees Harry G. Hubert, S. P. Woodward, and Hubert & Woodward.

Woodruff & Holloway, of Brownwood, for appellees Inter-State Nat. Bank and Inter-State Cattle Loan Co.

McCLENDON, C. J.

Day Ranch Company (designated herein Day Company) sued Hubert & Woodward on several promissory notes given as consideration for leases of ranch lands covering, respectively two periods: The year 1922, and from January 1, 1923, to April 1, 1924. Since no complaint is made of the judgment in favor of Hubert & Woodward, based upon a discharge in bankruptcy, that phase of the case will not be further noted. Cattle and other live stock belonging to Hubert & Woodward and covered by chattel mortgages held by the Inter-State National Bank and Inter-State Cattle Loan Company (designated herein Inter-State Companies) were pastured on the leased property during the lease period; and the Inter-State Companies were sued on the notes and lease contracts, upon the following theories:

1. That Hubert & Woodward were notoriously insolvent; the Inter-State Companies' loans were in excess of the value of their security, and they were therefore the real owners of the cattle; and Hubert & Woodward were their agents in executing the notes and making the lease contracts.

2. That the Day Company had agister's and equitable liens upon the cattle superior to the mortgage liens. And

3. That the Inter-State Companies had obligated themselves to pay the debt due the Day Company.

The judgment was in favor of the Inter-State Companies upon a directed verdict, and the Day company has appealed.

The questions the appeal presents are whether the Day Company made a prima facie case against the Inter-State Companies under any of the above theories. The pertinent facts follow:

Hubert & Woodward were stockmen, operating upon a large scale. In 1921 they owed the Inter-State Companies a large sum of money secured by duly registered chattel mortgages on their live stock. These loans were extended from time to time during the years 1922 and 1923. In the fall of 1921 there was a slump in the live stock market, followed by a steady further decline during 1922 and 1923. The evidence will support a finding that during 1922–1923 Hubert & Woodward were in financial straits and possibly insolvent. Their financial condition was known both to the Day Company and the Inter-State Companies. January 1, 1922, Hubert & Woodward executed one of the notes in suit in favor of the ranch company, which recited that it was given to cover a lease for the year 1922, on certain designated ranch lands; and January 1, 1923, the remaining notes in suit were executed in like manner with a like notation as to consideration for the second loan period.

All of the notes were signed by Hubert & Woodward and by the individual members of the firm. Under the lease agreements, Hubert & Woodward had full possession and control of the pastures leased, with the right to use them or not and to pasture such live stock on them as they chose. On several occasions in 1921–1922–1923, Woodward went to Kansas City, and interviewed Hovey, president of the Inter-State Companies. The following quotation from his testimony substantially reflects the negotiations and relations existing between Hubert & Woodward and the Inter-State Companies:

"I went to his office in Kansas City and talked to him about my business in 1921. I discussed the question with him of my need of assistance in looking after the stock and buying feed for it, in 1921, 1922 and 1923. He asked me to furnish him some estimates of my needs along that line.

"During that term of years, 1921, 1922, and 1923, I included the items of necessary expense to hold the stock and carry them over one year to another, including the cost of pasturage. But I just do not remember the dates. I went more often in the spring of the year, and then I have gone along in the fall of the same year. That would make twice a year. I have furnished them a list of my needs in that respect; I have done such a thing: I have done that more than once; possibly so.

"As to what if any statement he made to me with reference to giving me assistance—he loaned me some money. As to whether he made any statement to me as to meeting any reasonable demands to cover expenses of that kind: Well, he let me have the money for it. I would get it in advance, and there would be times I would check on him and then send my expense account in on the last of the month. As to why I furnished him with a list of necessary expenses, pasturage, etc.—well, I did that you might say at his request."

"As to whether Mr. Hovey ever did tell me to promise anybody else that the bank or the loan company would pay any debt owed by us: I never did represent the bank in that capacity, no sir. He never did tell me to do that."

"In explanation of my statement that Mr. Hovey had told me that he would furnish me certain money: that was in the nature of a loan. That particular money was used for that particular purpose; it was used for that particular purpose every time."

In the fall of 1922 Woodward gave the Day Company a draft on the Inter-State Companies for $3,200, which was paid and credited on the notes. After the suit was filed, the live stock not theretofore sold and applied on the mortgages was sold by agreement of the parties, and the proceeds held in bank to abide the result of the suit.

■■ Upon the question of agency: There is nothing in the record to show that such relation existed. The facts that the value of the security had depreciated to such an extent that it would not bring the face of the mortgages, and that Hovey from time to time made advances, represented by additional loans, to Hubert & Woodward to cover expenses in connection with the live stock, were not sufficient we think to create that relation. The evidence is clear not only that the Inter-State Companies were interested in preserving their security and seeing that it was sufficient to meet the mortgaged debt, but that Hubert & Woodward were also trying to work out their financial troubles, not alone for the purpose of discharging the mortgages, but to secure for themselves an additional return. They were not in the employ of the Inter-State Companies, and their only interest in looking after the livestock was one personal to them, that is, to discharge their indebtedness and realize a surplus. It has been repeatedly held in this state that the relation of mortgagor and mortgagee, where the mortgagor is left in possession of property requiring care, sustenance, or upkeep, does not create the relation of principal and agent. Blackford v. Ryan (Tex. Civ. App.) 61 S. W. 161; Overland v. Findley (Tex. Civ. App.) 234 S. W. 106, 107.

Hovey did not bind his companies in any way to pay or discharge any obligations of Hubert & Woodward. Nor did he authorize them to contract any obligations on behalf of his companies. He merely made agreements from time to time to make additional loans to them to cover itemized statements of expense, and these agreements were carried out in each instance.

■ Furthermore, all of the facts relied upon to constitute agency were known to the Day Company, and the case therefore falls within the rule that when the principal is disclosed he cannot be held upon a contract in the name of the agent. Heffron v. Pollard, 73 Tex. 96, 11 S. W. 165, 15 Am. St. Rep. 764.

The cases of Blalack & Son v. Loan Co., 267 S. W. 474, and Commercial Co. v. Brown, 284 S. W. 911, both by the Commission of Appeals, are clearly conclusive we think of the priority of the mortgage liens over any equitable or agistment lien the Day Company might have had upon the mortgaged live stock. The holdings in these cases are clear and unequivocal, and we think it unnecessary to discuss them. They expressly overrule a number of decisions by the Courts of Civil Appeals upon which the Day Company relies.

■ Independently of the holdings in those cases, however, it is quite clear that the Day Company acquired no agister's lien, and we

seriously doubt whether any lien at all was acquired by them. The contract between Hubert & Woodward and the Day Company was not one for pasturage or for furnishing necessaries in the way of labor or supplies in connection with the care of the live stock. The transaction comes within the following rule: "Where pasture land is leased for grazing purposes, and the lessee is given absolute control, the statutory lien given to agisters is not available to the lessor, as the lessor does not feed, care for, or attend to the animals." See Hindes v. Lock (Tex. Com. App.) 259 S. W. 156; 2 Tex. Jur. p. 743, and authorities cited in note 12.

As already stated, there is nothing in the record to support a finding that the Inter-State Companies obligated themselves to pay the notes or the indebtedness represented thereby. If, however, the negotiations between Hovey and Woodward might under any view be susceptible of that interpretation, such promise would come within the Statute of Frauds (Rev. St. 1925, art. 3995, § 2).

The trial court's judgment is affirmed.

Affirmed.