## WILLIAMS v. DE BACA et al.
### No. 5160.

Court of Civil Appeals of Texas.
Texarkana.

Jan. 27, 1938.

King, Mahaffey, Wheeler & Bryson and O. H. Atchley, all of Texarkana, for appellant.

Elmer L. Lincoln, of Texarkana, Leon L. Mott and Gerald E. Veltmann, both of Houston, and A. K. Montgomery, of Santa Fé, N. M., for appellees.

HALL, Justice.

We adopt the agreed designation of the parties to this appeal, and appellant, Williams, will be referred to hereafter as plaintiff, appellee De Baca as defendant, and appellee Regional Agricultural Credit Corporation as the Corporation.

Plaintiff instituted this suit in the district court of Bowie county February 18, 1935, against defendant and the Corporation for damages occasioned by the alleged breach of the following contract:

"This memorandum of agreement made at Clarksville, Texas, this 26th day of November, 1934;

"Witnesseth; that the pasture known as the Hudson pasture and described as the Island of Horse Shoe Bend in Red River about 22 miles North East of Clarksville and about 25 miles North West of New Boston, Texas, also the Dyer place East and South of the Hudson place now leased by Joe Telford of DeKalb, Texas, also the Telford section 4 miles North of DeKalb, Texas, lying in Red River and Bowie County are hereby leased from date until June 1st, 1935, for the price of $4.50 (Four Fifty) per head for cattle. All weaned calves and up to be counted as one head and younger calves to be allowed to run with their mothers without charge.

"The cattle to be pastured under this contract are 2,000 (Two Thousand) head more

or less now owned by F. C. DeBaca of Bueyeros, N. M., which are under mortgage to the Regional Agricultural Corporation of Wichita, Kansas, Santa Fe branch. The man whom the above described pasture is leased is Storey Williams of Clarksville, Texas.

"The price agreed upon as above set forth amounts to a total more or less of $9,000.00 (Nine Thousand Dollars) to be paid as follows: $3,000.00 the 1st day of February 1935, the balance in four equal payments; to be made on the 1st of each month of February, March, April and May; based upon the actual number of cattle to be put in the pasture at the rate of $.75 (Seventy Five Cents) per head per month. Said check to be in the mail on the first day of each month from the Santa Fe, N. M. office.

"Said Storey Williams agrees to meet these cattle at destination now expected to be Avery, Texas. Drive them to the pastures and at the reshipping of the cattle to deliver them on board the cars. He further agrees to keep the fences in a state of good repair at all times and have it carefully gone over twice each week. In this connection it is clearly understood that Baca's man is charged with the duty of promptly advising men in the employ of said Storey Williams of any break of which he knows in the fences and clearly describe the spot where said break is, and if necessary accompany Williams' men to the break and see that the fence is repaired.

"Baca hereby agrees to keep a man who is thoroughly reliable and who knows all the brands with the cattle whose duty it is to see that this care is given to the fences and the cattle as above set forth, whose wages and maintenance are to be paid for by Baca, Storey Williams agreeing to see that supplies used by him are transported from railroad to his camp house whenever needed, the house and cook stove for use of this man are to be furnished by Storey Williams. The balance of the equipment to be furnished by Baca. In case it is found necessary to feed cake to the cattle Baca is to furnish the cake at distribution point in the pasture and said Storey Williams is to furnish the man to feed the cake. The salt in like manner is to be paid for and delivered to the distribution point by Baca same to be distributed by the men of Storey Williams.

"Said Storey Williams agrees to be responsible for the cattle aside from death from unavoidable natural cause and the proof of death is to be established by removal of the hide of said animal by Storey Williams' men; but the hide remains the property of said Baca. In case of animal dying in out of the way places and are not found until carcass is too badly decomposed to allow the skinning thereof, proof of death is to be established by removing the portion of hide containing the brand.

"It is further agreed that in case of condition of the Baca range does not warrant a return of these cattle to his range on June 1, 1935, he has the option to continue this pasture contract from month to month until the first of January 1936. The monthly payments due as set forth is to be made as before stated regularly the first of each month.

"It is hereby understood that in addition to the pasture above mentioned the J. V. Williams place and the Cowan Ranch are also available for pasture until March 1, 1935 and if possible to secure same, beyond that time to June 1, 1935, or until the expiration of the occupancy of the pasture.

"It is also provided that in case of a very favorable season in 1935 and it is clearly shown that the number of cattle can be increased without injury to the Baca cattle it shall be possible for the Regional Agricultural Credit Corp., to send more cattle to this ranch the same to be handled under the same requirement as provided in this contract.

"It is hereby agreed that immediately after the signing of this contract that all stray live stock either cattle or horses are to be cleared out from the pasture leased for said F. C. De Baca and no live stock put into the pasture during the life of this contract except those belonging to F. C. DeBaca or with his permission.

"It is hereby agreed that this contract is made with the sole purpose of the same being carried to completion, so in case any sale is made of this stock by the Regional Agricultural Credit Corpn., before the termination of this contract the parties purchasing the stock must assume the responsibility now undertaken by the present owners and carry the contract to completion.

"Witness:  F. C. De Baca
 "Ray Wagoner By F. C. De Baca, Jr.
 "T. E. Mitchell. Storey Williams."

On September 5, 1935, plaintiff filed his amended petition upon which he went to trial, and in which he alleged the execution of the above contract by all the parties thereto, the breach thereof by defendant and the Corporation, and the resulting damages to him of $6,810. He alleged, further, that

pursuant to the terms of said contract, and shortly after execution thereof, defendant and the Corporation placed 2,180 head of cattle in plaintiff's pastures where they remained until about January 25, 1935, when, without the consent of plaintiff, said cattle were removed; that the defendant and the Corporation have refused to pay the balance, or any part thereof, due on said contract; that plaintiff was able, willing, and ready to furnish pasturage to said cattle in accordance with the terms of said contract. Plaintiff alleged further that said pasturage contract was made by plaintiff and defendant with the consent and knowledge of the Corporation; that the Corporation was the holder of a chattel mortgage on said cattle and acquiesced in the making of said pasturage contract; that said cattle were in a starving condition and it was necessary to secure pasturage for them to protect the Corporation's security; that the Corporation paid the first installment under the contract, amounting to $3,000. Plaintiff also alleged an equitable and statutory lien on all said cattle and an attachment lien on about 100 head, and sought foreclosure of all said liens.

The Corporation answered by general demurrer, and numerous special exceptions, which were overruled by the court, and general denial. It answered specially to the effect that it held a chattel mortgage on all cattle in an amount largely in excess of their value, and that it had advanced large sums of money for transportation and feed in removing the cattle from New Mexico to Red River and Bowie counties, Tex.; that this expenditure of money was necessary to save said cattle, and, under the terms of its mortgage, became a part of said secured indebtedness; that a copy of said chattel mortgage was recorded in Red River county, Tex., on January 28, 1935, and in Bowie county, Tex., on February 9, 1935. It also alleged fraud on the part of plaintiff with respect to representations made by him concerning the amount of grass on said pasture land and the number of cattle same would carry during the months covered by the contract, as well as the number of men plaintiff had in his employ and their experience in handling and caring for cattle. The Corporation alleged, further, that the pasture was insufficient to carry the number of cattle placed thereon by De Baca, and as a result a large number died, and it became necessary to remove the cattle from the pastures during the last part of January, 1935, to feed lots in De Kalb, Tex., where they could be fed during the remainder of the winter; that said cattle were removed to the feed lots in pursuance of the terms of the chattel mortgage covering said cattle; that plaintiff consented to said removal, thereby waiving any lien he might have on said cattle by virtue of said pasturage contract. The Corporation alleged further that a large number of said cattle disappeared from said pastures which were unaccounted for by plaintiff, the value of which amounted to $8,240, which sum should be offset against any amount found to be due plaintiff by defendant; that any lien in favor of plaintiff by virtue of the writ of attachment levied on a portion of said cattle in July, 1935, is inferior to its chattel mortgage lien. The Corporation further alleged that plaintiff surrendered control of the pastures covered by the contract to defendant De Baca.

By supplemental petition plaintiff alleged that the Corporation was estopped to deny the existence of a statutory and equitable lien upon said cattle and was also estopped to deny that said liens were superior to his chattel mortgage lien. Plaintiff also denied the allegations in the Corporation's answer with respect to fraud, waiver of his liens, or his responsibility for the disappearance of any of said cattle. The defendant De Baca was served with nonresident notice, but did not appear and answer.

It appears from the record herein that the cattle in question at the time of the making of the contract for pasturage were located in the state of New Mexico on defendant's ranch and on account of severe drouth were in danger of starvation; that during the year 1934 the defendant in searching for pasturage for his cattle located the pasture lands involved in this suit, and in November, 1934, defendant, together with one T. E. Mitchell, inspector for the Corporation, came to Clarksville, Red River county, Tex., where they met with plaintiff and negotiated the pasturage set out above. The defendant did not come to Clarksville in person, but was represented in the negotiations by his son, F. C. De Baca, Jr. The record further reveals that an inspection of the several pastures included in the contract was made by Mitchell, F. C. De Baca, Jr., together with plaintiff and other persons. Some two or three days were spent in this inspection, and in drawing the pasturage contract. The original draft of the contract was written by Mitchell and, with some changes, was finally executed by plaintiff and defendant. The first payment on said

pasture contract was made by Mitchell by draft through the bank at De Kalb on the Corporation. Shortly after the execution of the contract, Mitchell left East Texas and went to his home in New Mexico, where he died during the holidays of 1934. During the first part of December, 1934, the cattle were shipped from the ranch in New Mexico to De Kalb, Bowie county, Tex., where they were delivered on December 12, 1934, to plaintiff; and he and his men, together with some of defendant's men, drove said cattle to the pastures covered by said contract which were located some fifteen or twenty miles north and northwest of De Kalb in and near the Red River bottom. The cattle were accompanied from New Mexico to De Kalb by a son-in-law, and possibly a son, of defendant. The evidence, we think, is conclusive of the fact that a large number of cattle were in poor flesh and some seventy-five or eighty died in transit, and seven or eight died on the way from De Kalb to the pastures. The cattle were removed from the pastures to feed pens in De Kalb on or about January 25, 1935, and were never put back in these pastures under the contract involved in this suit. We think the evidence conclusively shows that the grass in the pastures had either been eaten or trampled into the ground by said cattle at the time they were removed to the feed pens in De Kalb. The evidence also conclusively shows that it was necessary for the preservation of said cattle to remove them from the pastures to feed pens. The record shows that 2,180 head, not counting calves with their mothers, were delivered to plaintiff on December 13, 1934, to be placed in the pastures. The evidence further shows that some of defendant's men remained in a house furnished by plaintiff in or near one of the pastures where the cattle were located and directed the feeding of the cattle, their distribution to different pastures, and generally assumed control of the cattle. Plaintiff and his men did what they were told to do in the manner of feeding or distributing the cattle from one pasture to another and in looking after them. All the feed for said cattle was furnished by defendant and delivered to the pastures by him. After the cattle were delivered to the feed pens in De Kalb, it seems that the Corporation through one Briscoe took charge of them and had them fed and cared for until some time in May, when they were put back in some of the same pastures, but under a new contract with a different party. In the latter part

of July, 1935, plaintiff caused attachment to be levied on about 100 head of said cattle. The facts show further that plaintiff was not the owner of the pastures covered by said contract but was a lessee of same and sublet the premises to defendant. It is uncontroverted that after the removal of the cattle from the pastures plaintiff was relieved of the payment of over $2,000 in rentals for some of the pastures by surrendering same to the owners thereof. The evidence is undisputed that the Corporation had a chattel mortgage on all these cattle securing an indebtedness owing by defendant to the Corporation of about $98,000, and that the value of these cattle was $65,000.

In answer to special issues the jury found: (1) That on the date of the levy of the writ of attachment the cattle were in possession of defendant; (2) that the value of the property securing the debt due by defendant to the Corporation was $65,000; (3) that the cattle levied on by the sheriff under the writ of attachment were part of the herd of cattle shipped to Bowie and Red River counties from New Mexico; (4) that the lands included in the contract from plaintiff to defendant contained sufficient grass to sustain the cattle placed on them; (5) that all the cattle were accounted for by plaintiff; (7) that the Corporation advanced the sum of $1,540 for the care and maintenance of the 110 head of cattle under attachment; (8) that the plaintiff represented to defendant's representative that he had pasturage sufficient in acreage and grass, grazing capacity, and feed value to sustain a herd of at least 2500 head during the six months covered by such contract; (9) that the defendant and his representatives believed such representations made by the plaintiff; (10) that the defendant and his representatives relied upon such representations made by plaintiff; (11) that such representations made by plaintiff were not untrue; (12) that the plaintiff consented to the removal of the cattle at the time they were removed from the pastures; (13) that the pasturage furnished by plaintiff to defendant was necessary to preserve the lives of defendant's cattle; (14) that the Corporation acquiesced in the making of the contract between plaintiff and defendant at the time it was made; (15) that the cattle were placed for pasturage on the lands described in plaintiff's petition in keeping with the contract made between defendant and plaintiff with the knowledge and consent of the Corporation; (16) that the Corporation knew of the making of the contract be-

tween plaintiff and defendant at the time said contract was made; (17) that the Corporation assisted the defendant in making the contract with plaintiff; (18) that the contract between plaintiff and defendant was partly made for the benefit of the Corporation; (19) that plaintiff was induced to surrender the possession of the cattle to defendant on the promise of said defendant to pay the balance remaining due under the contract.

Upon motion of the Corporation to enter judgment for it notwithstanding certain answers of the jury, the trial court entered judgment for the Corporation, and the plaintiff has appealed.

The principal contention of plaintiff on this appeal is that, on account of the pasturage contract between him and defendant made partly for the benefit of the Corporation, acquiesced in by it, and with its full knowledge, he has a statutory lien and an equitable lien on all the cattle placed in said pastures to secure the balance due under such pasturage contract; and that, by virtue of the levy of the writ of attachment in July, 1935, he has an attachment lien on the number of cattle levied on to secure the balance due under such pasturage contract; and that these liens are superior to the chattel mortgage lien of the Corporation. It will be noted under the contract that neither the Corporation nor any one acting for it promised to pay any part of the consideration of same. Under the plain terms of said contract the promise to pay the consideration was by defendant De Baca, and the fact alone that the Corporation paid the first installment due under the contract would not make it liable for the balance due thereon or damages for breach thereof. Day Ranch Co. v. Hubert & Woodward, Tex.Civ.App., 32 S.W.2d 252, writ denied. So, when we determine the priority of the liens asserted by the plaintiff and Corporation, in our opinion, we have correctly solved the problem presented by this appeal. The statutory lien claimed by plaintiff arises, if at all, under article 5502, which is: "Proprietors of livery or public stables shall have a special lien on all animals placed with them for feed, care and attention, as also upon such carriages, buggies or other vehicles as may have been placed in their care, for the amount of the charges against the same; and this article shall apply to and include owners or lessees of pastures, who shall have a similar lien on all animals placed with them for pasturage."

The equitable lien claimed by plaintiff is said "to arise either from a written contract, which shows an intention to charge some particular property with a debt or obligation, or is declared by a court in equity out of general considerations of right and justice as applied to relations of the parties and circumstances of their dealings." It has been held in this state, and seems to be the settled law, that, where cattle or other stock are placed with a party for pasturage without the acquiescence of the third person holding a valid, prior, registered chattel mortgage, the statutory lien arising from said transaction in favor of the party furnishing the pasturage is inferior to the chattel mortgage held by the third party. Blalack & Son v. San Antonio Cattle Loan Co., Tex.Com.App., 267 S.W. 474; Commercial Credit Co. v. Brown, Tex. Com.App., 284 S.W. 911; Day Ranch Co. v. Hubert & Woodward, supra. It is seriously doubted whether, under the pasturage contract entered into by both parties and the evidence relating to the care, supervision, and control of the cattle after they were placed in the pastures, plaintiff has a statutory or equitable lien to secure him for pasturage and services already performed, even as against defendant. Hindes v. Lock et al., Tex.Com.App., 259 S.W. 156, and cases there cited. But, conceding that plaintiff had a statutory and equitable lien and that the Corporation knew of the contract and acquiesced in its making, and that it thereby made its own chattel mortgage lien inferior to the statutory or equitable lien arising in favor of plaintiff, for pasturage already furnished, still we do not believe that said statutory lien or equitable lien would extend to damages due for the breach of the rental contract after the cattle were removed from said pastures. Article 5502, R.S.1925, is plain in its terms, and, in our opinion, fixes a lien in favor of proprietors of livery stables and owners of pastures for debts already due for feed, care, and maintenance and the pasturage furnished, and not for damages for the breach of a contract to furnish same. For example, A places his horse with B in his livery stable under a contract for three months at 50 cents per day. A takes the horse out of B's stable after thirty days. He pays B for the thirty days B has kept his horse. B sues A for the remaining

sixty days of the contract. Certainly it could not be said that B had a lien on A's horse to secure the payment of the sixty days under said contract when his horse was not in the stable and being cared for by B. The same would be true with respect to the rights of the parties under the contract set out above. It is conceded that the full rental for said pasture was paid up to February, 1935. The cattle were removed from the pastures and placed in feed pens at De Kalb on January 25, 1935, about five days before the pasturage period was up for which plaintiff had already been paid. Certainly, then, it cannot be successfully contended that either the statute or equity will create a lien in plaintiff's behalf for pasturage to be furnished. We are inclined to agree with plaintiff's statement in his brief that "the continued possession by plaintiff of the cattle was not necessary to the continued existence of his statutory lien to secure him for the debt defendant owed him for having kept, pastured and cared for these cattle." But the undisputed evidence is that plaintiff has been paid for those items and he is now seeking to fix and foreclose liens both statutory and equitable, not for pasturing, keeping, and caring for the cattle, but for the alleged balance due under said contract after the cattle had been removed from the pasture to feed pens in De Kalb. As said before, the evidence conclusively shows that the pastures at the time the cattle were removed to De Kalb were eaten out or the grass trampled down. There was nothing in the pastures for the cattle to eat, or not sufficient feed to carry them, and the evidence is without dispute that it was impractical to feed the cattle in these river bottom pastures on account of an unprecedented amount of rain. We conclude, therefore, under all the facts and circumstances of this case, that, as to future rentals or damages arising out of the breach of the contract in controversy, plaintiff has no lien, either statutory or equitable. Plaintiff has cited no case, nor have we found any, that holds contrary to this conclusion. The two cases cited by appellant and upon which he mainly relies are American Surety Co. of New York v. Bay City Cattle Co., Tex.Civ. App., 268 S.W. 247, writ refused; and Houston Nat. Exchange Nat. Bank v. De Blanc, Tex.Civ.App., 247 S.W. 897. We have examined these cases carefully, and we find in both of them the fact that the pasturage had already been furnished the cattle and payment therefor had been refused, hence the statute and principles of equity fixing a lien on the cattle were held to apply. The latter case, in so far as it holds that the statutory lien and the equitable lien in cases of this character were superior to a registered chattel mortgage, was expressly overturned in Blalack & Son v. Cattle Loan Co., supra.

We shall next consider the attachment lien. The sheriff's return upon the writ of attachment is as follows:

"The within writ came to hand on the 3rd day of July, 1935, and I executed the same on the 11th day of July, 1935, by levying on approximately 100 head of cattle belonging to the within named defendant, F. C. De Baca, and running on the range in the west end of Bowie County, Texas, the said cattle being branded, some of them 𝒴 and the remainder Y, each brand being upon the right thigh, I made such levy in the presence of Jim Evans and F. M. Hudson was witnesses, and gave notice in writing of such levy to F. C. De Baca, Jr., agent of F. C. De Baca, as well as to Ira J. Briscoe agent of the Regional Agricultural Credit Corporation.

"In the testimony whereof witness my hand officially this the 13th day of July, A. D. 1935.

Fee:
Serve 2 copies       4.00
100 miles @ 7½¢      7.50
                    ———
     Total          11.50
                      "G. H. Brooks

"Sheriff of Bowie County, Texas."

At the time this levy was made, the cattle were in one of the pastures under another contract with another party. This pasture was inclosed by fence and—did not comprise more than 4,000 acres of land, even if it were the largest pasture covered by the new pasturage contract.

Article 290, R.S., is: "When personal property is attached, the same shall remain in the hands of the officer attaching until final judgment, unless a claim be made thereto and bond be given to try the right to the same, or unless the same be replevied or be sold as provided by law."

Article 3794, R.S., is: "A levy upon live stock running at large in a range, and which cannot be herded and penned with-

out great inconvenience and expense, may be made by designating by reasonable estimate the number of animals and describing them by their marks and brands, or either; such levy shall be made in the presence of two or more credible persons, and notice thereof shall be given in writing to the owner of his herder or agent, if residing within the county and known to the officer."

Article 298, R.S., is: "The officer executing the writ of attachment shall return the writ, with his action endorsed thereon or attached thereto, signed by him officially, to the court from which it issued, on or before the first day of the next term thereof. Such return shall describe the property attached with sufficient certainty to identify it, and shall state when the same was attached, and whether any personal property attached remains still in his hands, and, if not, the disposition made of the same. When property has been replevied he shall deliver the replevy bond to the clerk to be filed with the papers of the cause."

The evidence, we think, is conclusive that the cattle levied upon by the sheriff were not on open range, but were in an enclosed pasture, and that the levy made by him as disclosed by his return on said writ was insufficient in law to fix an attachment lien on the estimated number of cattle levied on. The sheriff did not take the cattle into his possession but left them with Briscoe, the agent of the Corporation. He did not know the exact number of cattle levied upon, but later found out from Briscoe and by actual count that there were 110 head.

In 27 Tex.Jur. p. 488, § 24, it is said: "In levying upon livestock confined in a pasture or other inclosure of moderate size, the officer should follow the method prescribed as ordinarily necessary to the validity of a levy upon personal property, that is, he must take possession and control of the stock. This may be done by entering the inclosure and driving the cattle to a point for the purpose of counting them, while armed with the writ; and the officer is allowed a reasonable time to reduce the stock to actual possession. But no valid levy is made if the officer merely rode among the cattle, counted them and left them without segregating them from other cattle in the pasture or making any arrangements to put a caretaker in charge.

"It has been held that the range levy statute applies where the acreage embraced in a pasture is so extensive that the cost of herding or otherwise keeping the cattle would be as great as though they were not in an inclosure."

When cattle sought to be attached are within an inclosed pasture, unless the pasture is so large as to amount to an open range, it is necessary that the officer executing the writ take said cattle into his possession in order for the levy to be legal and fix an attachment lien. Gunter v. Cobb, 82 Tex. 598, 17 S.W. 848; Osborn v. Paul, Tex.Civ.App., 27 S.W.2d 572. The largest pasture shown by this record upon which the cattle were located contained 4,000 acres, and would not under the reasoning of Gunter v. Cobb, supra, be equivalent to an open range. But, if we should be mistaken in this view and it be concluded that the attachment was legal and fixed a lien on said cattle, still it would avail plaintiff nothing. As said before, this attachment was levied in the latter part of July, 1935, after the cattle had been removed from the pastures some six months, and six months after the alleged breach of the contract and nearly six months after a copy of the chattel mortgage of the Corporation had been duly filed in both Red River county and in Bowie county. Therefore we conclude that the attachment lien is too late in point of time to be superior, or even equal to, the chattel morgage held by the Corporation.

We have carefully examined all other assignments brought forward by plaintiff, and they are overruled.

The judgment of the trial court is affirmed.