W. D. FENLEY et al., Appellants,

v.

Ben OGLETREE et al., Appellees.

No. 4949.

Court of Civil Appeals of Texas.

Beaumont.

March 10, 1955.

Rehearing Denied March 30, 1955.

139

V. A. Collins, Ross Hightower, Livingston, J. A. Barnes, Beaumont, for appellee.

ANDERSON, Justice.

This action, in form of trespass to try title and for damages, was brought by the plaintiffs against W. D. Fenley, James E. Faulkner, A. P. Willis, Joe Denham, and eleven other defendants to recover 319 acres of land in San Jacinto County, a part of the Uriah Gibson Survey, and to recover the value of timber the defendants were alleged to have cut and removed from said land and converted to their own use and benefit.

The defendants, with the exception of A. P. Willis, answered by general denials and pleas of not guilty. Defendant Willis, in addition to entering a general denial, pleaded that he was an innocent purchaser for value of all logs that came into his possession from the land in controversy. The co-defendants of W. D. Fenley and James E. Faulkner also pleaded for recovery over against the said Fenley and Faulkner for all sums the plaintiffs might recover against the cross-actors; this upon the theory that Fenley and Faulkner, representing themselves to be the owners thereof, had sold to cross-actors the timber which gave rise to plaintiffs' suit against the latter.

A joint motion for an instructed verdict was made by all of the defendants at the close of the evidence and was overruled. The plaintiffs then moved for dismissal of their suit against all of the defendants except W. D. Fenley, James E. Faulkner, and A. P. Willis. This latter motion was granted, and all of the defendants except the three just named were dismissed from the action, at the cost of the plaintiffs. The case was then submitted to a jury on special issues which pertained only to the quantity and the value of timber cut and removed by the defendants from the land in controversy.

James E. Faulkner, Cold Springs, Kirby Kelley, Shepherd, for appellant.

In response to the special issues submitted to it, the jury found that, under con-

tracts made by the defendants Fenley and Faulkner, timber from the land in controversy to the extent of 75,000 board feet, of the value of $35 per thousand feet, was delivered to the defendant Willis, and pulpwood to the extent of 417 units, of the value of $3 per unit, was delivered to defendant Joe Denham.

Judgment was rendered that plaintiffs recover of the defendants, Fenley, Faulkner, and Willis the land in controversy together with the sum of $2,625 as the value of the timber received by Willis, and that they recover of the defendants Fenley and Faulkner the additional sum of $1,250 as the value of the 417 units of pulpwood delivered to the defendant Joe Denham. In a separate instrument from the one embodying the judgment or the portion thereof just mentioned, an unconditional judgment was ostensibly rendered in favor of the defendant Joe Denham against his co-defendants W. D. Fenley and James E. Faulkner, and appropriate provision for execution to issue thereon was made; it was decreed that on his cross-action, and as the amount he had paid each of them for the 417.1 units of pulpwood delivered to him, the said Denham recover of Fenley the sum of $625.65, and of Faulkner a like sum, together with interest thereon at the rate of six percent per annum from December 31, 1951. Both judgments or parts of the judgment show on their faces to have been rendered and signed by the presiding judge on July 7, 1953. However, the instrument first referred to shows to have been filed with the clerk on July 8, 1953, and the other shows to have been filed July 11, 1953. From the judgment or judgments so rendered, the defendants Fenley, Faulkner, and Willis have perfected a joint appeal.

■ Neither of the appellants filed a motion for a new trial. As a consequence, we think that, of the twenty-four points of error they have brought forward, only those which complain of the refusal of the trial court to render judgment in their favor notwithstanding the verdict of the jury are properly entitled to consideration. Rule 324, Texas Rules of Civil Procedure,

as it existed prior to January 1, 1955; Traders & General Ins. Co. v. Scott, Tex. Civ.App., 189 S.W.2d 633; Miller v. Long-Bell Lumber Co., Tex.Civ.App., 217 S.W.2d 867, affirmed 148 Tex. 160, 222 S.W.2d 244. However, we feel that, with the exceptions to be noted, what we shall say during the course of the opinion, together with the disposition that is to be made of the case, will have the effect of answering and overruling the various points and the contentions made under them, or else will render harmless the matters assigned as error. We feel, also, that the discussion will make sufficiently clear the numerous questions raised, and we shall therefore not undertake in every instance to state appellants' contentions explicitly.

The plaintiffs undertook to establish a regular chain of title from the Sovereign to themselves, and may be taken to have done so unless they failed because of one or more of the specific matters to be mentioned. For our purposes, it is sufficient to say that they claim through Thomas H. Webb, James H. Webb, Joseph Adams, the heirs of Joseph Adams, and G. R. Ogletree, among others.

The appellants contend that there was no showing that James H. Webb ever acquired the title of Thomas H. Webb; but that if he did, title stemming from him, superior to that asserted by plaintiffs, was shown to be outstanding in one J. B. Kerby. They also contend that if title ever vested in Joseph Adams, they themselves are joint tenants with the plaintiffs by virtue of having purchased from an heir of the said Adams. Lastly, they contend that a deed from G. R. Ogletree to plaintiffs was inadmissible in evidence.

As establishing passage of title from Thomas H. Webb to James H. Webb, the plaintiffs relied on a partition of the estate of the former after his death, which partition, it is claimed, was made by the Probate Court of Madison County, Texas. To prove such partition, they introduced in evidence from the deed records of San Jacinto County the record of what had been certified December 2, 1879, by the

clerk of the county court of Madison County as a true copy of a part of the Probate minutes of that court in the matter of the estate of Thos. Webb, deceased. The certified copy was filed for record in the office of the county clerk of San Jacinto County on March 5, 1891, and was thereupon duly recorded in the deed records of that county. Included with and as part of the records certified from Madison County, recorded in San Jacinto County, and introduced in evidence from the deed records of the latter county, was the following order or decree of the district court of Madison County:

"On the 17th day of August A.D. 1875. This day came on to be heard the motion of Jas. H. Webb, administrator of the estate of Thomas Webb, deceased, to substitute the original record and papers of the estate of said decedent, and it appearing to the satisfaction of the court that said record and papers had been in existence in the Probate Court of said Madison County and that the same had been destroyed by fire: It is therefore ordered and adjudged & decreed by the court that the motion of said administrator be granted and that the papers herewith filed and sworn to be recorded as substantial copies of the original record of said administration and that same be recorded as such.

"James R. Burnett, Judge
"District Court for 30th
"Judicial District."

■ The substituted probate records were not void and lacking in probative value as evidence because of a want of jurisdiction or lack of authority in the district court of Madison County to order their substitution. At the time the order of the district court was entered, there was in effect an Act of the Fourteenth Legislature which authorized the court to act in the premises. Vernon's Ann.Civ.St. arts. 6582 et seq. It became effective April 14, 1874, and was entitled, "An Act to provide for the supplying of lost Records in the several counties in this State." Acts 14th Leg., p. 100; Gammel's Laws of Texas, Vol. 8, p. 100 (102); Craddock v. Scarborough, 54 Tex. 346. Section 1 of the Act provided, among other things, "That * * * any and every judgment of a court of record in this State, and which record and minutes of court containing such judgment have been lost, destroyed or carried away, may be supplied by parol proof of the contents thereof, which proof shall be taken in the manner hereinafter provided." Section 2 provided: "Any person having any interest in such deed, instrument in writing or judgment, the record or entry of which has been lost, destroyed or carried away, may in addition to any mode now provided by law for establishing the existence of such record, and the contents thereof, apply to the district judge of the district in which such county, the records of which have been lost, destroyed or carried away, is situated, for a citation to the grantor in such deed, or to the party or parties interested in such instrument of writing, or to the party or parties who were interested adversely to the applicant at the time of the rendition of any such judgment, or who may now be interested, or the heirs and legal representatives of such parties, to appear at a term of the district court * * *; and on hearing said application, if the court shall be satisfied of the existence of such deed, instrument in writing, record or judgment and of the loss, destruction or carrying away of the same, as alleged by the applicant, and the contents thereof, an order shall be entered on the minutes of the district court to that effect, which order shall contain a description, of the lost deed, instrument in writing, judgment or record, and the contents thereof; and a certified copy of such order may be recorded in the records of the county, and shall stand in the place of and have the same force and effect as the original of said lost deed, instrument in writing, judgment or record; and when duly recorded may be used in evidence in any of the courts of this State with like effect as the original thereof."

■ Since the district court, a court of general jurisdiction, had jurisdiction of the

subject matter, and acted in the premises, it will be presumed, in the absence of evidence to the contrary, that all prior requisites to rendition of the judgment by it had been fulfilled. Hare v. Reily, Tex.Civ. App., 269 S.W. 473, 476, affirmed, Tex.Com. App., 280 S.W. 543; Maes v. Thomas, Tex. Civ.App., 140 S.W. 846, error refused; 17 Tex.Jur. 295, Evidence–Civil Cases, Sec. 83.

■■ The fact that as certified by the clerk of the county court of Madison County the copy of the judgment of the district court was not accompanied by a copy of the certificate of the clerk of the latter court neither rendered the certified copy of the probate proceedings unrecordable in the deed records of San Jacinto County nor the record thereof in the latter county inadmissible in evidence. The substituted decree of partition was certified as a decree of the county court and as a part of the minutes of that court, not as a judgment or decree of the district court, and it was entitled to be so considered and treated, once its substitution had been authorized and it had been recorded in the probate minutes as provided by law. The Act under which it was substituted expressly provided that in such circumstances the substituted judgment or record should "stand in the place of and have the same force and effect as the original of said lost * * * judgment or record."

■ The substituted probate records, together with a copy of the district court judgment, having been actually recorded in the probate minutes of Madison County, it will be presumed, there being no evidence to the contrary, that the copy of the district court judgment was a certified copy; this being but another way of saying that, in the absence of a showing to the contrary, the county clerk of Madison County, having acted within the general scope of the duties imposed on him by law in recording the substituted records, is presumed to have acted rightfully, in a lawful manner, and within his authority, and the existence of facts necessary to authorize his action will be presumed—he would not have been authorized to record the substituted records in

the absence of a certified copy of the judgment of the district court. Crain v. Huntington, 81 Tex. 614, 17 S.W. 243; Wright v. Giles, 60 Tex.Civ.App. 550, 129 S.W. 1163; 17 Tex.Jur. 278–283, Evidence–Civil Cases, Secs. 76, 77.

■ The matter of importance, in the circumstances, is that the destroyed records of Madison County were in fact substituted in a legal manner; the fact that the most complete evidence of the legality of that substitution was not supplied the county clerk of San Jacinto County is not controlling.

■ The fact that there may be no statutory provision for the recording of probate matters generally in the deed records of a county did not render the certified copy of the decree of partition unrecordable in the deed records of San Jacinto County. The decree is properly classified, we think, as a judgment, and Article 6635, Vernon's Texas Civil Statutes, is as follows: "County clerks shall record all judgments and abstracts of judgments rendered by any court of this State presented to him for record when attested under the hand and seal of the clerk of the court where such judgment was obtained." However, even though not properly classified as a judgment, the decree and partition proceedings were authorized, and even required, by Article 6638, V.T.C.S., to be recorded, said Article of the Statutes being as follows: "Every partition of land made under an order or decree of a court, and every judgment or decree by which the title to land is recovered shall be duly recorded in the office of the county clerk in which such land may lie; and until so recorded, such partition, judgment or decree shall not be received in evidence in support of any right claimed by virtue thereof."

■ More than ten days before the trial the plaintiffs filed among the papers of the cause a list of recorded instruments they desired and proposed to introduce in evidence, giving the volume and page wherein such instruments were recorded,

and among the instruments so listed was the aforesaid certified copy of the decree of partition. No affidavit of forgery was filed by any of the defendants. The certified copy of the decree is an instrument in writing which is and was permitted by law to be recorded in the office of the clerk of the county court of San Jacinto County, the county in which the land is situated and the suit was pending, and it had been therein actually recorded for more than ten years. In these circumstances, by authority of Article 3726, V.T.C.S., the plaintiffs were entitled to place said decree of partition in evidence by reading the same from the deed records of San Jacinto County; it was not necessary that they procure a certified copy of the decree from either the county or the district clerk of Madison County.

 Standing alone, the description by which the land in controversy was awarded to James H. Webb in the decree of partition might not be legally sufficient in a deed of conveyance to convey the land, for the description made no reference to either the state, county, or survey in which the land is situated, and was merely as follows: "Beginning at the S.E. corner No. 3. Thence N 70 E 928 vrs to 2nd corner Thence N 30 W 1942 varas to 3rd corner Thence S 70 W 928 vrs to 4th corner Thence S 20 E 1942 varas to the beginning." However, the partition proceedings and the decree of partition must be construed together and as a whole, and when they are so construed the land allotted to James H. Webb is identified with sufficient certainty. In the order to the Commissioners appointed to partition the estate the total assets of the estate were listed, and one of the items listed was 1914 acres of the ———— in San Jacinto County. The report of the Commissioners, the approval of which constituted the partition, then awarded to each of five other of the heirs a numbered block of land consisting of 319 acres in the Uriah Gibson Survey. Other land in other counties was dealt with in the partition, but it can all be accounted for by sufficiently described tracts awarded to various of the heirs. It is apparent, there-

fore, that the Uriah Gibson Survey was divided into six numbered tracts, each containing 319 acres, the aggregate being the 1914 acres referred to as being in San Jacinto County. A comparison of the field notes of the tract in controversy with the field notes of the other five tracts leaves no doubt that the tract awarded J. H. Webb was one of the six tracts in the Uriah Gibson Survey, being in fact Lot or Tract No. 4.

We express the opinion that James H. Webb acquired legal title to the land in controversy, and shall next consider appellants' contention that a legal title superior to that asserted by plaintiffs was shown to be outstanding in J. B. Kerby.

The plaintiffs claim title through James H. Webb by virtue of a deed from Webb to Joseph Adams which bears date of August 12, 1872, but which was not filed for record until April 9, 1934. They also hold a quitclaim deed from John L. Wills, dated June 14, 1934, and they introduced evidence to prove that he was the only heir of S. H. Wills, deceased. The defendants introduced in evidence a deed from James H. Webb to S. H. Wills, and from S. H. Wells to J. B. Kerby. The former bears date of October 20, 1876, and was filed for record June 19, 1880; the latter, the deed from Wells to Kerby, bears date of September 3, 1921, and was filed for record September 29, 1921.

 Even assuming that S. H. Wills (grantee in the deed from Webb) and S. H. Wells (grantor in the deed to Kerby) were one and the same person, there was no evidence, other than the record as just indicated and recitations in the deeds of a cash consideration paid, to show that either Wills or Kerby was an innocent purchaser for value. Unless the one or the other of them was an innocent purchaser for value, the junior line of conveyances did not vest superior title in Kerby. The burden of proving that either Wills or Kerby was an innocent purchaser for value rested on the appellants and was not discharged by the mere introduction of the deeds to Wills and Kerby and by showing that they were given long before the senior deed out of the com-

mon grantor was recorded. Watkins v. Edwards, 23 Tex. 443; Hawley v. Bullock, 29 Tex. 216, 217; Holland v. Nance, 102 Tex. 177, 114 S.W. 346; Hartel v. Dishman, 135 Tex. 600, 145 S.W.2d 865; Herbert v. Smith, Tex.Civ.App., 183 S.W.2d 191, 193. The subject is thus treated of in the case first cited, Watkins v. Edwards: "To entitle a subsequent vendee to have a prior unregistered conveyance postponed to his subsequent conveyance, it must appear: 1st. That he was a purchaser, bona fide; 2nd. That he purchased without notice, actual or constructive, of the title of the prior vendee. It must appear that the purchase money was bona fide and truly paid; a recital of that fact in the deed is not sufficient. It must be proved by evidence, independently of the recitals in the deed. That this is necessary to support the plea of innocent purchaser, is well settled." We conclude, therefore, that since neither S. H. Wills nor J. B. Kerby was shown to have been an innocent purchaser for value, neither of them was shown to have ever acquired title to the land; and it is not necessary that we discuss the question of whether S. H. Wills and S. H. Wells are idem sonans or whether a fact issue as to their being one and the same person was raised by the evidence.

██ The plaintiffs claim under a deed from G. R. Ogletree, who died after the deed was made. The deed was introduced in evidence as an original instrument, and proof of its execution and delivery was made by plaintiff Ben Ogletree, a son of the decedent. His testimony was objected to as being a transaction with the decedent and as contravening the provisions of Article 3716, V.T.C.S., and the deed was objected to on the basis that there had been no legal proof of its execution and delivery. Article 3716 prohibits parties to a suit from testifying to transactions with or statements by a decedent only in those instances where the action is by or against the executor or administrator of the estate of the decedent or is by or against the heirs or legal representatives of the decedent and arises out of a transaction with the decedent. The present action does not fall within any of the classifications mentioned, and so the statute has no application to it. The estate of the decedent was in nowise involved. The plaintiffs neither sued as the heirs or legal representatives of G. R. Ogletree, nor claimed the land as his heirs; they claimed under a deed. The testimony of the plaintiff, Ben Ogletree, was properly admitted in evidence, as was also the deed. Wootters v. Hale, 83 Tex. 563, 19 S.W. 134; Ivy v. Ivy, Tex.Civ.App., 128 S.W. 682.

The defendants Fenley and Faulkner introduced in evidence two deeds to themselves from one C. L. Adams, and undertook by the testimony of Fenley to show that C. L. Adams was an heir of Joseph Adams, deceased, under whom the plaintiffs also claim. One of these deeds bears date of December 15, 1951; the other bears date of May 13, 1952, prior to which this suit had been instituted January 7, 1952. The defendant Fenley, over an objection that was not ruled on, testified that at the time he dealt with the said C. L. Adams the latter told him that he (Adams) was a son of the aforesaid Joseph Adams, deceased. There was no other evidence tending to prove that C. L. Adams was an heir of Joseph Adams. Neither was there any other evidence tending to show that C. L. Adams owned any interest in the land at the time he made the aforesaid deeds. The plaintiffs, who themselves claim through the heirs of Joseph Adams, introduced evidence to show that Joseph Adams had only seven children who survived infancy, among whom there was only one son, G. T. Adams. This evidence was supplied through the testimony of George E. Winborn, a grandson of Joseph Adams.

██ In this state of the record, we think the appellants' contention that the evidence at least showed Fenley and Faulkner to be joint owners with the plaintiffs of the land in controversy is without merit. The testimony given by the defendant Fenley was inadmissible hearsay. The declaration which was attributed to L. C. Adams, his claim that he was a son of Joseph Adams, deceased, was not admissible under the exception to the hearsay rule which in proper circumstances permits the introduction of

hearsay to prove pedigree. The applicable rule is thus expressed in Texas Law of Evidence (McCormick & Ray) Sec. 601, p. 762: "Bias or prejudice would be fatal to the trustworthiness of the declaration. To guard against it the courts have established the rule that the declarant must have been disinterested, i. e. had no interest or motive to deceive, at the time when the declaration was made. Under this rule declarations as to the declarant's heirship or relationship to a certain person, made after descent cast upon him as to property belonging to such person are not admissible in behalf of the declarant or persons claiming that property under him." The declaration by Adams was made after descent had been cast as to the property of Joseph Adams, deceased, and at a time when he himself was endeavoring to sell or was in process of selling his asserted interest in the land in controversy; it was a self-serving declaration, was hearsay in the form in which it was introduced in evidence, and was inadmissible. Byers v. Wallace, 87 Tex. 503, 28 S.W. 1056, 29 S.W. 760; Jamison v. Dooley, 98 Tex. 206, 82 S.W. 780; Wolf v. Wilhelm, Tex.Civ.App., 146 S.W. 216, error refused. Furthermore, there was no showing by appellants of their inability, for acceptable cause, to produce upon the trial the testimony of L. C. Adams himself; and such a showing appears to be necessary before declarations of the kind under discussion are admissible under the exception to the hearsay rule which has been invoked. Wolf v. Wilhelm, supra; Texas Law of Evidence, Sec. 599, p. 759, and the cases there collated.

■ Since the testimony of defendant Fenley was hearsay and was not admissible under any of the recognized exceptions to the hearsay rule, it was without probative value to establish the relationship sought to be proved. Texas Co. v. Lee, 138 Tex. 167, 157 S.W.2d 628, 631. In the cited case, the Supreme Court, speaking through Justice Sharp, had the following to say: "Under the state of this record, the recital that the Tidal Oil Company is now the Tide Water Oil Company is hearsay, and it is incompetent to establish any fact in the way of a title against the defendant. Such incompe-tent evidence can never form the basis of a finding of fact or of the judgment of a court; and this is so whether it be objected to or not. Henry v. Phillips, 105 Tex. 459, 151 S.W. 533; Austin Bros. v. Patton, Tex. Com.App., 294 S.W. 537; 17 Tex.Jur., p. 521, § 211."

Being of the opinion that by undisputed evidence, and as a matter of law, the plaintiffs established in themselves title to the land and timber in controversy, we pass now to a consideration of the timber conversion phase of the case.

■ The evidence introduced by the plaintiffs on this phase of the case consisted largely of the depositions of the various defendants who were finally dismissed from the suit. These depositions were objected to by the appellants for various reasons, and points complaining of their admission in evidence have been brought forward. However, since the particular evidence bore altogether on the issues which were submitted to the jury or on the phase of the case that was decided on jury findings, and no motion for a new trial was filed in the trial court, we decline to pass upon the points; the depositions will be considered as having been properly introduced in evidence. Rule 324, T.R.C.P.; Traders & General Ins. Co. v. Scott, supra, 189 S.W.2d 633; Miller v. Long-Bell Lumber Co., supra, 217 S.W.2d 867.

■ The evidence was not only sufficient to require submission to the jury of the special issues which were submitted, but was sufficient to support the findings of the jury in response to said issues. The defendants who were dismissed from the suit, other than Joe Denham, cut and hauled timber from the land and delivered all of it to either the defendant A. P. Willis, a sawmill operator, or to the defendant Joe Denham, a pulpwood contractor. One group of them cut trees of certain dimensions and delivered them to Willis; the other group cut trees of smaller dimensions, and also salvaged the tops of the trees cut for saw logs, and delivered them to Denham. The area over which this cutting took place was suffi-

ciently identified circumstantially: the cutting operations covered only a short span of time; the land was inspected shortly afterwards, and the stumps of trees which had been recently cut could be easily identified and distinguished from those of trees that had been cut at other times; it was sufficiently shown that the defendants were the only ones who had cut in the particular area at the particular time; and when the area was described by plaintiffs' witnesses during the trial, none of the defendants undertook by his testimony to dispute the correctness of the description so given. The quantity of both saw logs and pulpwood that had been recently removed from the area was estimated by S. L. McAdams shortly after the defendants ceased cutting. He testified upon the trial of the case, qualified as an expert witness on estimating timber, and gave in evidence his findings as to the quantity of timber that had been cut and removed from the land during the period of time in issue. The quantity of saw timber found by him to have been cut and removed, and actually converted into saw stock, when computed by the scale most favorable to the defendants, was 128,088 board feet. He testified that there had been 248,598 feet of saw timber removed but that 120,510 feet of it had been converted into pulpwood. He estimated the quantity of pulpwood, sold as such by the defendants from the land, at 417.1 units. One of the haulers who had hauled to defendant Willis was of the opinion that he himself hauled in the neighborhood of 25,000 feet of timber from the land, and that another hauler who worked with him hauled slightly less; whether or not only the two of them were hauling is not entirely clear from the record. The defendants Willis and Denham each had available to himself the quantity of logs and pulpwood he received, and presumably the defendants Fenley and Faulkner knew or could have ascertained the quantity for which they were paid, but neither of them by his testimony disputed the findings and estimates testified to by McAdams. At least two different witnesses testified to the market value of the timber. The values testified to ranged from $30 to $40 per thousand feet for the saw timber, and the witnesses were agreed that the pulpwood had a value of $3 per unit.

Those who cut and removed the timber did so relying on timber deeds from the defendants Fenley and Faulkner. A deed which on its face conveyed to Ernest Johnson the saw timber was joined in by both Fenley and Faulkner October 22, 1951; a deed conveying to L. V. McCardell all of the pulpwood owned by Faulkner was made by Faulkner November 25, 1951; and a deed which on its face conveyed to Willie Spiller a one-half interest in the pulpwood was made by Fenley December 3, 1951. The grantees in these deeds were granted the right to go upon the land at any time before, but not after, January 1, 1952, for the purpose of cutting and removing the timber ostensibly conveyed by the deeds. The deeds provided that the saw logs were to be delivered to defendant A. P. Willis and that the pulpwood was to be delivered to Joe Denham. They also provided that Fenley and Faulkner were to be paid weekly for the timber as it was delivered, and fixed the amounts said parties were to receive per thousand feet of saw logs and per unit of pulpwood. It was understood in advance that all amounts becoming due to the said Fenley and Faulkner were to be paid them direct by Willis and Denham, and they were so paid. The balance of the gross sales price was paid by Willis and Denham to either the vendees named in the timber deeds or the cutters and haulers. Such of the cutters and haulers as were not parties to the timber deeds acted under and by authority of the vendees in those deeds, and it also appears that, with perhaps one or two exceptions, they were orally assured by the defendant Faulkner that if it was satisfactory with the vendees in the timber deeds it was satisfactory with him for them to participate in the removal of the timber. The vendees in the timber deeds, as well as others among the cutters and haulers, testified that before purchasing the timber or before entering upon the land they were assured by defendants Fenley and Faulkner that they (Fenley and Faulkner) owned the land and timber. And the defendant Faulkner, a lawyer, testified that if he was asked

about the title he no doubt made such representations.

 We are of the opinion that on the facts as outlined the defendants Fenley and Faulkner were properly held liable to the plaintiffs for the value of the timber that was cut and removed from the land. The general rule which we think is recognized and applied by our courts, and which is supported by the weight of authority elsewhere, is that one who, without authority, assumes to sell timber on another's land, or the right to cut it, anticipating that such timber will be cut and intending that it shall be, is liable for the trespass of the purchaser in cutting it. Kolb v. Bankhead, 18 Tex. 228, 232; Annotation, 127 A.L.R. 1016; 41–A Tex.Jur., 473, Trespass, Sec. 12. See, also, American Law Institute, Restatement Torts, Vol. 1, p. 363, ch. 7, Sec. 158 i; McClanahan v. Stephens, 67 Tex. 354, 3 S.W. 312, 313. The rule as stated, at least in principle, was given application by our Supreme Court in the case of Kolb v. Bankhead, supra, wherein one who pointed out trees on another's land and assumed to sell them to a third person was held liable as for trespass when his vendee cut the trees. And we think it was impliedly recognized as being the law in this state in the case of McClanahan v. Stephens, supra, wherein it was said:

"It was held in Wall v. Osborn, 12 Wend. [N.Y., 39] 40, and in Morgan v. Varick, 8 Wend. [N.Y., 587] 594, where persons sold personal property belonging to others, and directed or requested their vendees to take possession of it, and remove it, that this made the vendees trespassers. In Kolb v. Bankhead, 18 Tex. 232, it was held that one who pointed out and sold to another, timber standing on the land of a third person, which he had no right to sell, was responsible as a trespasser for a cutting by his vendee, which the vendor knew was intended when he sold. In these cases, the sellers, in effect, directed the doing of the illegal act; themselves did it through the agency of other persons.

"To render the appellants liable for the acts of their vendees it must be made to appear that they acted in concert in doing the illegal act, or that the injury was the ordinary or natural result of some act which they did."

We do not consider the rule as stated by us to be inconsistent with the following expression appearing in Torrey v. Schneider, 74 Tex. 116, 11 S.W. 1068, 1070: "In the absence of some such states of fact as shown in the cases above referred to, we are of opinion that there can be no joint trespass unless there be command, advice, or encouragement to the actual trespasser, or concert and co-operation in the commission of a trespass, or subsequent ratification or adoption by one of an act of another for his benefit or in his interest." And it is altogether in harmony with the American Law Institute's conception of the general rule of law which we think applicable in the circumstances; we quote: "If, by any act of his, the actor intentionally causes a third person to enter land, he is as fully liable as though he himself enters. Thus, if the actor has commanded or requested a third person to enter land in the possession of another, the actor is responsible for the third person's entry, if it be a trespass. This is an application of the general principle that one who intentionally causes another to do an act is under the same liability as though he himself does the act in question." American Law Institute, Restatement Torts, Sec. 158 i.

Even if we are presumptive in assuming that the rule as herein stated is already the established or recognized law of this state, we nevertheless feel that reason and common prudence dictate that, in the absence of a contrary expression by the Supreme Court, it be adopted and given application. A different rule would be a tacit invitation to the unscrupulous to attempt by use of timber deeds and financially irresponsible vendees to reap unjust benefits from the timber of others.

 Of the fact that those who actually went upon the land and cut and removed the timber were trespassers, there can be no doubt their entry was intentional, was without the consent of the true owners, and was

unlawful. 41–A Tex.Jur. 466, Trespass, Sec. 3. The fact that they acted in good faith and in reliance on the timber deeds from Fenley and Faulkner does not alter the situation. 41–A Tex.Jur. 471, Sec. 9. They acquired no rights under the deeds in either the land or timber, because neither Fenley nor Faulkner had any rights in either to convey. In removing the timber and applying it to their own uses after it had been severed from the land, said parties were also guilty of conversion. 42 Tex.Jur. 515, Sec. 9; 28 Tex.Jur. 365, Sec. 4.

The defendants Fenley and Faulkner executed and delivered the timber deeds above mentioned with the intent that they be relied upon and acted upon, and with the intent and in the expectation that entry would be made upon the land and that the timber which they authorized to be cut would in fact be cut and removed from the land by their vendees or under their authority. They also intended and expected that the timber, once it had been severed from the land, would be converted to the use and benefit of their vendees, and that they themselves would benefit from the conversion. The trespasses and conversions that followed delivery of the deeds were not only the ordinary, natural, and probable consequences of the deeds, they were the expected and desired consequences. Furthermore, if it cannot be said that Fenley and Faulkner actually either requested or directed their vendees to cut, remove, and convert the timber, it can at least be safely said that they encouraged them to do so, and that the deeds were the procuring causes of the trespasses and conversions with which we are concerned. In addition, defendants Fenley and Faulkner, with full knowledge of the facts, accepted and retained a part of the money that was derived from sale of the timber; and in this sense and to this extent they approved and adopted as their own the acts of the actual trespassers and converters.

The foregoing considerations distinguish this case from the case of McClanahan v. Stephens, supra; and, under the rule we have stated, they, together with the facts of the case generally, clearly establish liability on the part of defendants Fenley and Faulkner for trespass. Also, we think the facts of this case are not distinguishable from those in Kolb v. Bankhead, supra, wherein a judgment against the vendor for his vendee's trespass was affirmed.

■ The same underlying general principle of law that renders defendants Fenley and Faulkner liable for the trespasses also renders them liable on the facts of the case for the conversions of the severed timber. This is the principle that "one who intentionally causes another to do an act is under the same liability as though he himself does the act in question." American Law Institute, Restatement of Torts, Sec. 158 i, supra. It is a principle which we think was impliedly recognized by the Supreme Court in the cases of McClanahan v. Stephens, supra, and Torrey v. Schneider, supra. In this connection, i. e., in connection with the general subject of conversion by the sale of another's property, see, also, 42 Tex.Jur. 523, sec. 16; 53 Am.Jur. 829, Trover and Conversion, Sec. 35; Moore v. Carey Bros. Oil Co., Tex.Com.App., 269 S.W. 75, 39 A.L.R. 1247; Collier v. Wm. Cameron & Co., 55 Tex.Civ.App. 153, 117 S.W. 915.

■ We conclude, therefore, that the judgment in favor of the plaintiffs against defendants Fenley and Faulkner for the value of the timber is sustainable upon both the theory of trespass and the theory of conversion. The defendant A. P. Willis is liable for conversion; with knowledge of its source, he received the severed timber into his actual possession from persons who had no authority to transfer it, and then converted it to his own use and benefit. The fact that he received the property as a purchaser does not relieve him from liability. Nunn v. Padgitt Bros., Tex.Civ.App., 161 S.W. 921; 42 Tex.Jur. 526, sec. 17; American Law Institute, Restatement of Torts, Vol. 1, p. 574.

There is left for discussion only the question of whether the judgment that was rendered in the case is a final judgment, and

the matter of the award of damages that was made or was attempted to be made in favor of the cross-actor Joe Denham.

We think the judgment of the trial court was final, even though it made no express mention or disposition of the cross-actions which were filed or attempted to be filed against defendants Fenley and Faulkner by their co-defendants. It is sufficient, of course, if the cross-actions or supposed cross-actions were disposed of in the judgment by necessary implication. Trammel v. Rosen, 106 Tex. 132, 157 S.W. 1161. However, we are of the opinion that in fact and as a matter of law there were no cross-actions pending before the court when judgment was rendered. The pleading of A. P. Willis amounted to no more than a prayer; it stated neither a cause of action nor the basis of a cause of action. In its entirety, it was as follows: "Defendant further represents, that if the plaintiffs prevail in this suit, that any judgment rendered herein against him, that he have judgment over and against his vendor, James E. Faulkner and D. Fenley for any sums recovered against him, this defendant." If such pleading could be treated as a cross-action, it was nevertheless abandoned, because Willis neither offered evidence in support of it nor moved for judgment in his favor, but made common cause with the defendants Fenley and Faulkner. The remaining cross-actors pleaded for recovery only in the event the plaintiffs recovered against them and only to the extent of the plaintiffs' recovery. When the plaintiffs' suit against these cross-actors was dismissed and it was thereby rendered impossible for the condition on which the cross-actions were predicated ever to come to pass, we think that as a matter of law the order of dismissal had the effect of also dismissing the cross-actions. It at least left the cross-actors without any pleadings before the court that would support a judgment. In the circumstances, we think it was not essential to the finality of the judgment that the supposed cross-actions and cross-actors be specifically mentioned and disposed of beyond what was accomplished by dismissal of the plaintiffs'

suit against said parties. See, Clay v. Marmar, Tex.Civ.App., 156 S.W. 1125; Burton Lingo Co. v. First Baptist Church, Tex.Com.App., 222 S.W. 203, 3-A Tex.Jur. 109, sec. 81.

As stated earlier, the award of damages that was made or attempted in favor of the cross-actor Joe Denham was contained in a separate instrument from the one in which the plaintiffs were granted recovery; and this has given rise to the question of whether it was an attempted second judgment. The trial court obviously intended that the two instruments should be construed together as its judgment, and they will be so treated. Rachford v. Builders' Lumber Co., Tex.Civ.App., 278 S.W. 225. So construed, the judgment allows a double recovery against defendants Fenley and Faulkner for the 417 or the 417.1 units of pulpwood; the plaintiffs, as well as the said Denham, were unconditionally awarded the value of the pulpwood against the same defendants. This was improper; and, as already stated, there were no pleadings before the court to support any such recovery by cross-actor Joe Denham. Also, there was no evidence before the court to support the judgment in favor of Denham. The trial court should have held the cross-action dismissed; failing which, judgment should have been rendered that the cross-actor take nothing. The matter is sufficiently raised by the appellants' motion for judgment non obstante veredicto, and to the extent that it failed to render judgment that cross-actor Joe Denham take nothing against the defendants Fenley and Faulkner the trial court erred in overruling said motion.

On the basis of what has been said, the judgment of the trial court in favor of the plaintiffs is in all things affirmed; the judgment in favor of cross-actor Joe Denham is reversed, and judgment is here rendered that he take nothing; and the costs are charged one-half to the appellants and one-half to the appellee, Joe Denham.

Affirmed in part and reversed and rendered in part.