Robert McVEA, Appellant,

v.

Billy VERKINS et al., Appellees.

No. 1447.

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 30, 1979.

Ralph Brown and Michael W. Bahan, San Antonio, for appellant.

Gerald M. Birnberg, Michael A. Maness, Houston, for appellees.

## OPINION

BISSETT, Justice.

This is a suit filed by Robert McVea against Billy Verkins and Melvin Powers on January 3, 1978, to recover damages for an alleged conversion of cattle. It was stipu- lated that the defendants were entitled to an offset of $9,607.93 against any judgment that might be rendered against them for money previously paid by them to a bank for the benefit of McVea and the bank. Following a jury trial, judgment was ren- dered on October 2, 1978, that the plaintiff McVea recover nothing against the defend- ants Verkins and Powers. McVea has ap- pealed. The plaintiff-appellant will be re- ferred to by name, and the defendants-ap- pellees will be referred to as "defendants" or by name.

On November 7, 1977, the date of the alleged conversion, McVea, as lessee, was in possession of a 479 acre tract of land under a written lease with Powers, as lessor. The jury, insofar as the disposition of this ap- peal is concerned, found that on November 7, 1977, 80 cows, 30 calves and 2 bulls owned by McVea were on the 479 acres; that there was no conversion of the cattle; that the acts of defendants were not malicious; and that the "fair market value" of the cattle on that date was $17,787.59.

McVea contends that a conversion of the said cattle on November 7, 1977, was estab- lished as a matter of law. He attacks the finding relating to "fair market value" with a "no evidence" point, a "factually insuffi- cient evidence" point and "an against the great weight and preponderance of the evi- dence" point. We, therefore, have read the record in its entirety and dispose of this appeal in accordance with the guidelines set out in Calvert, "No Evidence" and "Insuffi- cient Evidence" Points of Error, 38 Texas L.Rev. 359 (1960). We first determine whether there was a conversion as a matter of law.

The defendants contend that there was no conversion as a result of Verkins' acts on November 7, 1977, because: 1) they had a right to possess the cattle pursuant to a valid agister's lien under Tex.Rev.Civ.Stat. Ann. art. 5502 (1958); 2) their conduct did not exclude the exercise of any rights by McVea with respect to the cattle; 3) they originally came into possession of the cattle with McVea's consent; 4) they had a right

to possess the cattle pursuant to a valid landlord's lien on the cattle; 5) Verkins' action on November 7, 1977, was justified in order to secure a reasonable time to investigate the rights of the parties; 6) they were reasonably exercising, in good faith, a distinct legal right to protect timber on the leased premises from imminent destruction by McVea; and, 7) McVea did not demand that they surrender possession of the cattle to him. We do not agree.

A written lease, for grazing purposes only, covering a tract of 479 acres of land in Gonzales County, Texas, effective November 1, 1976, was executed by and between Powers, as lessor, and McVea, as lessee. The lease was for a term of 4 years, commencing November 1, 1976, and provided for a rental of $1,920.00 per year, payable annually in advance. The lease contained the following express covenants:

"5. *LESSEE'S COVENANTS:* Lessee covenants to Lessor as follows:

(a) That he will well and punctually pay rents as herein required and quietly surrender the premises unto Lessor on the day of expiration hereof in as good condition as the same were when received, reasonable wear and tear being excepted.

(b) That he will use said premises for grazing of livestock only and for no other purpose.

(c) That he will not put improvements or cross fences upon the premises without the prior written consent of Lessor.

(d) That on failure to pay the rent in advance, as aforesaid, or to comply with covenant herein made, Lessor may pursue any of the remedies provided by law and Lessor, his agent or attorney shall have the right and power to enter upon and hold, occupy and take possession of the leased premises. In this connection, it is agreed that Lessor shall have a landlord's lien upon all personal property of Lessor (sic) placed upon such premises to secure Lessee's performance hereunder."

McVea went into possession of the 479 acre tract on or about November 1, 1976, and stocked the pasture with cattle. He paid the first year's rental contemporaneously with the signing of the lease. He did not pay the advance annual rental on November 1, 1977, when it became due.

On October 16, 1977, Verkins, who was Powers' "property manager," learned that wood was being cut on the leased premises. He attempted to contact McVea but was unsuccessful. He did, however, reach "someone" at the McVea residence in response to a telephone call which he made on October 18, 1977. He said that he told that person: "Please tell Mr. McVea to stop the timber cutting."

A day or so before the day of the alleged conversion of the cattle on November 7, 1977, Verkins was notified that a considerable number of trees had been cut on the leased premises. Verkins then left his office in Houston, Texas, and went to the pasture. On arrival, he said that he found several places where large quantities of freshly-cut wood had been stacked. He concluded that McVea was responsible. He said that it was apparent to him that there would be additional woodcutting and more wood removed from the premises unless something was done. He purchased new locks and chains and installed them on all exterior gates to the pasture. Following the changing of the locks, he proceeded to Gonzales, Texas, and filed a criminal complaint against McVea, which charged the latter with felony theft. Later on during the day, he located McVea at a barbeque stand and engaged him in conversation. According to Verkins, he asked McVea why "he was continuing to cut wood on the property." He said that McVea told him he "was cutting the wood for barbequing." Verkins then informed McVea that he had filed a criminal complaint against him earlier in the day. Concerning the leased premises, Verkins told the jury: "I told him not to go on the property . . . I would be in contact with him within three days or for him to contact me within three days"; and to "please call me and let's get this re-

solved; but, I don't know what to do about it right now without legal counsel." Concerning the cattle, Verkins testified that he told McVea: "We will notify you about getting your cattle out." McVea testified that Verkins "told me don't do anything with the cattle until I had heard from him."

McVea's account of the conversation was different. He denied that he ever cut any wood on the leased premises. He testified that Verkins accused him of destroying trees on the property, that Verkins said to him: "Do not go on my premises anymore." McVea then told the jury: "I offered to pay him his rent. He said: 'As of this moment, your lease is cancelled and do not go on my premises anymore until I let you know' . . . that if I was caught on there, I would be shot.'"

At the trial while being cross examined, Verkins denied that McVea offered to pay the past due rent or that he told McVea that his lease had been terminated. However, the record shows that requests for admissions were served on Verkins on June 2, 1978, and that he made no response thereto. On the opening day of trial (August 14, 1978), the trial judge ordered that the facts inquired about in McVea's requests for admissions be "deemed admitted as true and correct." Included in the requests was "admission three," which requested that Verkins admit or deny that on the date of the alleged conversion "you informed Plaintiff that his lease was terminated."

Upon returning to Houston, Verkins contacted Powers' lawyer and told him of the events which occurred on November 7, 1977. By letter dated November 9, 1977, which was prepared by Powers' lawyer, Powers notified McVea that he was in breach of the lease in two respects: 1) by cutting timber on the property which constituted an unlawful taking of property; and 2) by failing to timely pay the annual rental of $1,920.00, which was due on November 1, 1977. The letter also stated:

"You are further notified that the Landlord's Lien upon all personal property as granted in Section V Lessor's (sic) Covenants is hereby affected and that formal demand is made upon you for the amount of rent past due; and you are further notified that all right, title and interest you have in and to the premises is hereby terminated because of your breach; and you are further notified that any attempt to enter in and upon the property shall be termed trespassing upon said premises."

McVea received the letter on November 10, 1977.

The only express covenants to be performed by the lessee (McVea) in the lease contract are those which appear in Section V thereof, heretofore copied verbatim. There is no express covenant which prohibited McVea from cutting timber, although there is such an implied covenant when the contract as a whole is examined. While the lease does not contain an express forfeiture clause, the clear implication of the language in V(d) thereof is that the lease will be forfeited upon the "failure to pay the rent" in advance . . . or to comply with any covenant *herein made*." It can be argued that such language limits the right to terminate the lease (a forfeiture) to a breach of *express* covenants. Be that as it may, there is no provision in the lease which permits the lessor, upon breach of covenant by the lessee, to take possession of the lessee's personal property on the premises. Cf. *Harris v. Panhandle & S. F. Ry. Co.*, 163 S.W.2d 647 (Tex.Civ.App.—El Paso 1942, writ ref'd w. o. m.)

It was said in *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex.Sup.1971): " . . . To constitute a conversion, it is not necessary that there be a manual taking of the property in question. The unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion . . ."

■ Conversion may be direct or constructive; it is concerned with possession, not title; it is complete where a person unlawfully and wrongfully exercises dominion and control over the property of another

to the exclusion or defiance of the right of possession of the owner or of the person entitled to the possession of the property involved. 14 Tex.Jur.2d, Conversion, § 1.

■ As a general rule, a demand for the return of the property and a refusal to do so are required to establish a conversion by a person who lawfully obtained possession of the involved property. *Sunray Enterprises, Inc. v. Rosenaur,* 335 S.W.2d 670 (Tex.Civ.App.—DAllas 1960, writ ref'd n. r. e.); *Rice v. Lambert,* 408 S.W.2d 287 (Tex. Civ.App.—Corpus Christi 1966, no writ); *Zerr v. Howell et al.,* 88 S.W.2d 116 (Tex. Civ.App.—San Antonio 1935, no writ). But, a demand and refusal are not necessary where the possession was acquired wrongfully. *Hicks Rubber Co., Distributors v. Stacy,* 133 S.W.2d 249 (Tex.Civ.App.—Austin 1939, no writ); *Cotten v. Heimbecher,* 48 S.W.2d 402 (Tex.Civ.App.—Amarillo 1932, no writ). Further, a demand and refusal are not required after the conversion has become complete, or where it is shown that a demand would have been useless. *Neyland v. Brammer,* 73 S.W.2d 884 (Tex.Civ.App.—Galveston 1934, writ dism'd).

■ Although an intent to do an act amounting to a conversion of personal property is necessary in order to constitute a conversion, it is the act of conversion itself that gives a right of action, and not the intention to convert. 89 C.J.S. Trover & Conversion § 7. Wrongful intent to convert another's property is not an essential element of conversion, nor is it material to any issue involved in a suit for conversion except as to the issue of exemplary damages. *Powell v. Forest Oil Corporation,* 392 S.W.2d 549 (Tex.Civ.App.—Texarkana 1965, no writ); 14 Tex.Jur.2d, Conversion, § 3.

■ In a conversion suit, it is no defense that the defendant acted in good faith. *Ligon v. E. F. Hutton & Company,* 428 S.W.2d 434 (Tex.Civ.App.—Dallas 1968, writ ref'd n. r. e.); *Fenley v. Ogletree,* 277 S.W.2d 135 (Tex.Civ.App.—Beaumont 1955, writ ref'd n. r. e.); *Chrysler Credit Corporation v. Malone,* 502 S.W.2d 910 (Tex.Civ.App.—

Fort Worth 1973, no writ); *White-Sellie's Jewelry Co. v. Goodyear Tire & Rub. Co.,* 477 S.W.2d 658 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ).

■ The provisions in a lease giving the lessor the right to re-enter the premises upon default by the lessee, and those giving the lessor a contractual landlord's lien upon the personal property of the lessee located on the leased premises, without more, do not authorize the lessor to take possession of the lessee's personal property subject to the lien. In order to enforce a landlord's lien and to obtain possession of the property subject thereto, absent consent by the lessee, the landlord must foreclose the lien by judicial proceedings, and in no other way. *Schwulst v. Neely,* 50 S.W. 608 (Tex.Civ. App., 1899, no writ). When the lease is silent with respect to the taking of possession of personal property subject to the landlord's lien, if the lessor-landlord, without resorting to legal proceedings to foreclose the landlord's lien, takes possession of the lessee-tenant's personal property situated on the leased premises without the consent or permission of the tenant-lessee, he is, generally speaking, subject to liability for conversion. 35 Tex.Jur.2d, Landlord and Tenant, §§ 158, 159.

■ It is a well-established rule at common law that a landlord-lessor cannot terminate the written lease of his tenant-lessee for breach of a covenant in the lease without first making a demand upon the tenant for such performance. It is only where the lease contains an express waiver of demand that the common law rule can be disregarded. *Wutke v. Yolton,* 71 S.W.2d 549 (Tex.Civ.App.—Beaumont 1934, writ ref'd); *Shepherd v. Sorrells,* 182 S.W.2d 1009 (Tex.Civ.App.—Eastland 1944, no writ); *Gray v. Vogelsang,* 236 S.W. 122 (Tex.Civ.App.—Galveston 1921, no writ).

■ It is quite clear from the record that the taking of possession and control of McVea's cattle by Verkins on November 7, 1977, cannot be justified on the ground that Powers had a right to possess the cattle pursuant to a valid agister's lien under the

provisions of Tex.Rev.Civ.Stat.Ann. art. 5502 (1958), as asserted by Verkins and Powers. The lease between the parties was not for the furnishing by the defendants of any feed, supplies, services or labor in connection with the care of the cattle placed by McVea on the leased premises. The lease shows conclusively that McVea, as lessee, was given exclusive and absolute control over the cattle operation; therefore, the statutory agister's lien was not available to Powers, since he, the lessor, was not authorized to (and did not) feed, take care of, or attend the cattle at any time prior to the "locking-out" of McVea on November 7, 1977. *Day Ranch Co. v. Hubert & Woodward et al.*, 32 S.W.2d 252 (Tex.Civ.App.— Austin 1930, writ ref'd); *Hindes v. Lock*, 259 S.W. 156 (Tex.Comm'n App. 1924, opinion adopted); *Caprock Industries, Inc. v. Wood*, 549 S.W.2d 430 (Tex.Civ.App.— Amarillo 1977, no writ).

In the case before us in this appeal, though the lease gave Powers (lessor) the right to re-enter and take possession of the leased premises on default of payment of rent, or upon breach of any covenant *"made"* in the lease, there is no provision therein which waived the demand and notice requirements imposed by law. The legal significance of the absence of a waiver of demand provisions in the lease herein involved is that Powers, the owner of a contractual landlord's lien, was required to make demand for performance *before* exercising any right of re-entry, even though a right of re-entry was expressly provided in the lease, and such demand was further required to be made in accordance with the common law. *Shepherd v. Sorrells*, supra, at page 1012. Since the defendants did not make a formal demand for the payment of past due rent and did not make a formal demand for possession of the land for breach of covenant in accordance with the common law rule, the re-entry and the taking of possession of the 479 acre tract of land was not warranted on the ground that McVea had defaulted in the covenant to pay the rent on the day it became due (November 1, 1977), or because of breach of covenant. The only formal demand for the payment of rent and for possession of the leased premises was made in the aforesaid letter of November 9, 1977. The contractual rights of Powers to cancel or terminate the lease for breach of covenant by McVea is the right to do so in the manner provided by law, and this Court will not, in aid of a cancellation of the lease here involved, imply a waiver of demand and notice.

There is no evidence that McVea consented to the taking of possession of his cattle by Verkins on November 7, 1977, or that he consented to his being "locked-out" of the leased premises on that day. There is no basis for the defendants' assertion that their conduct on the day in question did not exclude the exercise of any rights by McVea with respect to the cattle. The testimony of McVea to the effect that he would be shot if he was caught on the leased premises and that he was told not to do anything with respect to the cattle until after he had heard from Verkins stands unchallenged. The defendants admitted that Verkins threatened McVea "with criminal trespass if he were to go on the property." The claim by the defendants that they had a right to *possess the cattle on November 7, 1977*, "pursuant to a valid landlord's lien on the cattle" is without merit. The lease, as written, provides for a landlord's lien upon all personal property of *lessor*, not upon all personal property of *lessee*. That fact was ignored by the parties at the trial of this case and all parties tried the case as if the lease provided for a landlord's lien upon all personal property of the lessee. In view of our disposition of this appeal, it is not necessary that we elaborate further on that matter. The security of a landlord's lien is one thing and the foreclosing of such a lien by simply taking possession of personal property on the leased premises is something else. The further contention that the act of changing the locks was required in order to secure a reasonable time to investigate the rights of the parties is also without merit. The rights of the parties were fixed by the terms of the lease itself and by the laws of this State. Moreover, an investiga-

tion of the legal rights of the parties was completed on November 9, 1977, when Powers wrote the above mentioned letter to McVea. That letter speaks for itself.

The defendants, in their brief, say:

"[t]he defendants were merely exercising their legal right to protect their property from imminent destruction by the plaintiff (and concomitantly, therefore they were not acting 'unlawfully or wrongfully') by placing new locks on the gate and directing the plaintiff not to enter the property without notifying the defendants."

There is no evidence in the record that Verkins or Powers, at any time, told McVea not to enter the property *"without notifying the defendants."* To the contrary, it is undisputed that Verkins told McVea *not* to enter the leased premises, and that if he was caught thereon he *would be shot.* With respect to "notifying," it is conclusively established that Verkins told McVea that he (Verkins) would notify him (McVea) "within three or four days," and further told him that "we will notify you about getting your cattle out." It is established absolutely that McVea did receive further notice in the form of Powers' letter, dated November 9, 1977. That letter, in no uncertain terms, "notified" McVea that he would not be permitted "to enter in and upon the property." No mention of the cattle was made in the letter, and Verkins did not "notify" McVea of anything concerning the cattle. Under the existing circumstances, McVea was not under any duty to contact the defendants concerning his cattle.

The conduct complained of consists of two separate and distinct acts of Verkins on November 7, 1977. *First,* he changed the locks on the gates, which deprived McVea of access to his cattle. *Second,* his order to McVea also deprived the latter of access to his cattle.

Verkins' acts of November 7, 1977, were deliberate and intentional. The defendants attempt to justify those acts under the rubric of "self-help." They rely on *Yarborough v. State,* 66 Tex.Cr.R. 311, 147 S.W. 272 (1912); *Vann v. State,* 43 Tex.Cr.R. 244,

64 S.W. 243 (1900); *Sims v. State,* 36 Tex. Cr.R. 154, 36 S.W. 256 (1896); *Fambrough v. Wagley,* 140 Tex. 577, 169 S.W.2d 478 (1943); *Hampton v. Sharp,* 447 S.W.2d 754 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n. r. e.); *Redmon v. Caple,* 159 S.W.2d 210 (Tex.Civ.App.—Texarkana 1942, writ ref'd w. o. m.); and *Ater v. Ellis,* 227 S.W. 222 (Tex.Civ.App.—Amarillo 1921, writ dism'd). Those cases are distinguishable from the case at bar in that the "defender" in each case was *in possession* of the involved property and the threat of destruction was imminent. That is not the case before us in this appeal. Here, the owner-landlord was not in possession of the leased premises, and there was no threat of imminent destruction of the property on November 7, 1977. Harm to the property was already an accomplished fact as a number of trees had already been cut, but, on the day in question no one was cutting any timber. We recognize that there existed a possibility that someone in the future might attempt to remove the timber that had already been cut and might also resume the cutting of wood. However, the threat of such removal and additional cutting did not appear to be imminent under the guise of self-help to the extent that Verkins was entitled, in protecting the timber from further destruction, to deprive McVea of his right to possession of his cattle.

In addition to the testimony already noted, Verkins also testified that McVea, after having admitted to cutting wood "for barbequing," then "hung his shoulders and said: 'Mr. Billy, Mr. Billy I am sorry, Mr. Billy.'" That attitude, in our opinion, does not suggest that Verkins was suddenly confronted with an imminent destruction of timber by McVea. It is undisputed that on November 7, 1977, persons other than McVea and the defendants had keys to the old locks in the gates. It is also undisputed that Verkins, at the time he changed the locks, had no evidence that McVea was the person who had cut the wood.

Even assuming that Verkins was warranted in concluding that McVea had cut wood on the leased premises, and as-

suming further that he had reasonable grounds to believe that McVea would continue to do so unless something was done to stop him, there were ample and speedy lawful means and remedies available without resort to self-help. The defendants made no attempt to stop the timber-cutting by resort to the courts. Instead, Verkins took matters into his own hands and acted as judge, jury and executioner. No emergency existed which warranted such drastic action. This case illustrates the problems caused by too much reflex and too little thought on the part of a landowner's agent. The act of changing the locks and the act of ordering McVea not to go on the leased premises were distinct acts of dominion wrongfully asserted over McVea's personal property, and amounted to a conversion of the 80 cows, 30 calves and 2 bulls as a matter of law. *Neyland v. Brammer*, 73 S.W.2d 884 (Tex.Civ.App.—Galveston 1933, writ dism'd); *Lawson v. Townsend*, 25 S.W.2d 170 (Tex.Civ.App.—El Paso 1930, writ dism'd); *Cox's Bakeries of N.D., Inc. v. Homart Develop. Corp.*, 515 S.W.2d 326 (Tex.Civ.App.—Dallas 1974, no writ); *Eisemann v. Emmons*, 399 S.W.2d 428 (Tex. Civ.App.—Eastland 1966, no writ); *Fenberg v. Fenberg*, 307 S.W.2d 139 (Tex.Civ. App.—Amarillo 1957, no writ); *Harnden v. McKinney*, 103 S.W.2d 869 (Tex.Civ.App.— San Antonio 1936, no writ); *Kilgore v. De Vault*, 82 S.W.2d 1048 (Tex.Civ.App.— Beaumont 1935, no writ); *Henderson v. Beggs*, 207 S.W. 565 (Tex.Civ.App.—Fort Worth 1918, no writ); *Crawford v. Thomason*, 53 Tex.Civ.App. 561, 117 S.W. 181 1909, writ ref'd.

■ Since the taking of possession of McVea's cattle was wrongful, McVea was not required to demand a return of the cattle before filing suit. Furthermore, the defendants could not have returned all of the cattle, had such a demand been made; this fact was known to all parties long before this suit was filed; therefore, a demand would have been useless. It is undisputed that the defendants were in actual possession and control of all the cattle from and after the changing of the locks until December 1, 1977, when 40 cows and 18 calves were sold by the defendants at public auction. It is further conclusively established that an indeterminate number of McVea's cattle died between November 7, 1977, and December 1, 1977. McVea's first, second and third points are sustained.

■ McVea, in this appeal, does not attack the jury's finding that there were 80 cows, 30 calves and 2 bulls on the leased premises on November 7, 1977, nor does he complain of the jury's finding that the defendants' acts of November 7, 1977, were not malicious. The jury found that the value of the cattle "on or about November 7, 1977" was "$17,787.59." There is some evidence that some of the cows may have had "Bang's Disease" on November 7, 1977. There is also some evidence that the fair market value of a healthy cow was from $225.00 to $350.00 in early November, 1977, while the fair market value of a cow that had "Bang's Disease" was considerably less. On December 1, 1977, 40 cows were sold by the defendants at an average sale price of $173.09 per head and 18 calves were sold at an average sale price of $100.47 per head. There is no evidence relating to the cattle market quotations on or about November 7, 1977, nor is there any evidence as to the value of McVea's cattle had they been offered for sale as a "herd" on the date of their conversion.

We believe that there was some evidence to support the jury's finding that the "fair market value" of the cattle on November 7, 1977, was $17,787.59," but, after carefully reviewing, considering and weighing all the evidence, we hold that the evidence is factually insufficient to support the finding and that the same is against the great weight and preponderance of the evidence. McVea's tenth point is overruled, but his eleventh and twelfth points are sustained. Our holdings in this case make it unnecessary for us to consider McVea's remaining points.

The judgment of the trial court is reversed. Judgment is here rendered that the acts of defendants on November 7, 1977, constituted a conversion of McVea's cattle

as a matter of law, and the cause as to actual damages which resulted from the conversion of the 80 cows, 30 calves and 2 bulls, is remanded to the trial court for a new trial. See *Neyland v. Brammer*, supra. The defendants, in any judgment which may be rendered against them following the new trial, are entitled to an offset of $9,607.93.

REVERSED and RENDERED in part; REVERSED and REMANDED in part.

NYE, C. J., dissents.

NYE, Chief Judge, dissenting.

I respectfully dissent. Viewing the evidence most favorably to the jury's verdict, I would find that there was not, in fact, a conversion. In Re King's Estate, 244 S.W.2d 660 (Tex.Sup.1951).